HENRY WARREN DAY, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

1. When on cross-examination of a state's witness he is asked a question tending to elicit a self-serving declaration on the part of the defendant when he handed the knife to the witness with which the deceased was stabbed, which question was not strictly in cross-examination of anything which the witness had said in his examination in chief, it is not erroneous in the trial judge to refuse to permit such a question.

2. In general there is no error in refusing to give requested instructions which are covered by the charges given by the trial judge, and the judge having succinctly given in his charge the law of self defense recognized by this court in previous decisions, the facts of this case are not such as require a more detailed statement of the law than that contained in the judge's charge.

3. The giving of cautionary instructions to the jury is necessarily a matter very much within the discretion of the trial judge, and it is not an abuse of that discretion for him to instruct the jury that the presence of the defendant's family in court should have no influence upon them in making up their verdict.

4. Where the defendant was convicted of murder in the second degree, it is unnecessary for this court to review charges applicable only to murder in the first degree.

This case was decided by Division B.

Writ of Error to the Circuit Court for Hillsborough County.

The facts in the case are stated in the opinion of the court.

*R. W. Davis and H. S. Hampton,* for plaintiff in error;

*W. H. Ellis,* Attorney General, for the state.

HOCKER, J.—Henry Warren Day, for convenience hereinafter called the defendant, at the Fall term of the circuit court of Hillsborough county was indicted for the murder of Albert B. Wren in said county, on the 8th of November, 1906, by stabbing, etc., him with a knife. The indictment charged murder in the first degree. He was tried in January, 1906, found guilty of murder in the second degree, and sentenced to the state prison for life. He has brought the sentence and judgment here for review on writ of error.

We think the following is a substantial summary of the evidence of the state: Mr. Day had a contract to carry the mails between the railroad depots and boats, and the postoffice. Mr. Wren was an employee of the

express company.  On the evening before the homicide Mr. Day and Mr. Wren had some words at the Atlantic Coast Line depot about their respective rights to place their conveyances so as to be accessible to the cars which brought the mails and the express matter.  Mr. Day, it appears had talked about this disagreement to several parties, and had said that he would not stand being bluffed, or of being deprived of his rights any longer.  On the evening of the 8th, about 7 o'clock Mr. Day had gone to the A. C. L. depot to meet the train, and arrived there some moments before the train.  He took a seat on a tool chest, near the telegraph office, on which also a Mr. Groover was sitting.  He and Mr. Groover were engaged in conversation and he alluded to the troubles of his position, and said, "I suppose you have heard of the trouble me and the police have  and now the Southern Express Company has butted into it."  About this time Mr. Wren came up and asked Day what the remarks were he had made about the occurrence of the evening before.  Day replied he had told Wren to move the floats and he had done so.  Wren replied he was a liar, and he was tired of these stories, and they had to stop or something to that effect.  The witnesses do not agree as to the exact words used, but generally agree that a good many oaths were used by Wren and in return by Day. Wren called Day a liar, and perhaps a scoundrel, and Day returned the epithet of liar.  After a short warfare of words Day got up from the tool chest, drew his knife from his pocket and opened it behind his back holding it in his right hand.  He then placed his left hand on Wren's arm or breast, and said several times: "Hit me, hit me."  Wren threw his hand off roughly, and then Day immediately commenced to cut and stab Wren— the latter backing away, and finally getting up against a truck—when someone caught hold of Day, and Wren staggered a step or two and fell on his face.  He was

cut and stabbed in eleven places, and died in a few moments—one stab wound penetrating the heart. Wren does not appear to have exhibited, or to have had any weapons. He was fifty-five years old, and larger than Day. One of the witnesses says he had a cigar. The place where the altercation occurred was lighted by electricity. One of Mr. Day's witnesses states that Wren struck Day first; but the majority of the witnesses who witnessed the altercation state that the affair occurred substantially as above stated. There were some conflicts in the testimony, but the jury were warranted in taking the foregoing view of it.

The assignments of error, which we will consider in the order in which they are argued, are:

1st. The court erred in overruling the motion for a new trial, which challenged the verdict as contrary to the evidence and weight of the evidence, and contrary to law. In reference to this assignment it is sufficient to say that we can discover nothing in the evidence, or lack of it, which would justify us in reversing the judgment. It shows some degree of premeditation on Mr. Day's part, in that he had a previous quarrel with Wren and amidst the exchange of epithets between Wren and himself he drew his knife from his pocket, opened it behind his back, keeping it open in his right hand and apparently concealed from Wren, placed his left hand on Wren's breast or arm, and said, "Hit me, hit me," as if challenging Wren to some overt act, which he, Day, might use as an excuse for the use of his knife upon Wren, who was unarmed. Moreover he ferociously followed up his first cut or stab with ten others, one in Wren's back, when it does not affirmatively appear that he was in the least danger of death or great bodily harm.

The fourth assignment of error, which is the next one argued, is in these words: "The court erred in re

fusing to permit defendant's counsel, in cross-examination of the witness. Tomberlin, who was a witness for the state, and who testified that he was a policeman and arrested defendant a few moments after the stabbing, and asked defendant who did the stabbing, and upon defendant telling said witness he did, and upon being asked what he did it with, was told by defendant with a pocket knife, which defendant then handed witness, the witness then being asked on cross-examination what the defendant then said to him about the knife and difficulty. The court ruled out the question, and refused to permit the witness to answer the same unless defendant would make said witness his witness." This assignment does not correctly state Tomberlin's testimony in chief. He was asked by the state: "Q. What position do you hold in the city of Tampa? A. Policeman. Q. Mr. Tomberlin, did you ever see that knife before? A. Yes, sir. Q. Where did you get it? A. I got it from Mr. Day. Q. When did you get it from him? A. A moment after I arrested him. Q. Where? A. At the Coast Line depot. Q. Is that the knife that A. B. Wren was cut with? A. Yes, sir. Q. What was the condition of the knife when you got it? A. The knife was closed; he drew it from his pocket; it was closed with blood on the blade, and on the handle and on the jaws; there was blood on one side of it up to about here; I just pulled the knife open that way and looked at it and put it in my pocket; the jaws was full of blood." Thereupon counsel for the state offered the knife in evidence. No objection was made and the said knife was admitted in evidence. Tomberlin was then turned over for cross-examination, during which he was asked: "Did the defendant say anything to you at the time he handed you the knife?" This question was objected to as not being in cross-examination of anything brought out on the direct examination, but the court ruled the question

could be answered, but that witness could not say what defendant said. The witness answered, "Yes," and was then asked: Q. "What did he say to you at that time?" This question was objected to as not being in cross of anything brought out on the direct examination, and on the further ground that statements made by the defendant in his favor after the transaction are not admissible. The objection was sustained. We discover no error in the ruling of the court. The question was not only not strictly in cross-examination, but it tended to elicit self-serving declarations. The acts of having the knife in his possession and of handing it to Tomberlin were not of such equivocal character as needed any explanation of his motive in having or delivering it. If it was the purpose of the question to elicit from Day a statement of his reasons for using it on Wren, such a statement would probably have been simply a self-serving one and inadmissible. This is not like a case where a party is found in the possession of property recently stolen which calls on him for a reasonable explanation of his possession. 3 Wigmore on Ev. § 1774. As a matter of fact the defendant was permitted to prove by another witness his whole conversation with the policeman at the time he delivered him the knife. We can discover no reversible error under this assignment.

The fifth assignment of error is based on the refusal of the court to give instruction numbered 4, requested by defendant. While the assignment is insisted on, it is not argued further than the assertion that it is sound law, which was not so thoroughly presented in either the court's charges or the other instructions requested by the defendant. The instruction is argumentative and we think was substantially given by other instructions of the court.

The sixth assignment of error is not argued.

The seventh assignment is based on the refusal of

the court to give the following instruction: "A person need not be in actual imminent peril of his life, or of great bodily harm before he may slay his assailant; it is sufficient if, in good faith, he has a reasonable belief from the facts as they appear to him at the time, that he is in such imminent peril, and if he acts with reasonable prudence and caution."

The eighth assignment is based on the refusal of the court to give the following instruction: "If the jury believe from the evidence that at the time the defendant is alleged to have stabbed the deceased, the circumstances surrounding the defendant were such as in sound reason would justify or induce in his mind, after reasonable prudence and caution, an honest belief that he was in danger of receiving from the deceased some great bodily harm, and that the defendant in doing what he did was acting honestly from the instinct of self-preservation, then he is not guilty, although there may in fact have been no real danger." In this connection the trial judge gave the following charge: "Homicide is justifiable when committed by any person in the lawful defense of such person when there shall be a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design having been accomplished; but unless such belief of danger is reasonable,—that is, unless a reasonably prudent and cautious man would entertain the same belief from the same appearances,—it will be no defense, even though it was an honest belief of danger. Men do not hold their lives at the mercy of the unreasoning fears or excessive caution of others; and if, from such motives the defendant killed the deceased, without real or apparent good reason for so doing, he cannot justify his act as being in self defense." This charge very succinctly states the law of self defense as recognized in this state, although it is given in a more

detailed form in some of the cases.    Morrison v. State, 42 Fla. 149, text 156, 28 South. Rep. 97, and cases cited; Lane v. State, 44 Fla. 105, 32 South. Rep. 896.    The defendant's testimony in his own behalf probably justi- fied the giving of this charge, but we did not discover from the facts of this case any necessity for a reiterated and more extended discussion of the doctrine of self defense.    Day's testimony alone furnished the predicate for these requested instructions.    After stating that Wren came up to him and began cursing him he says: "I saw it looked like he was going to come on me.    I raised up and when I did I backed back and he kept fol- lowing me.    I said I did not, and he said, 'You are a God damned liar,' and struck at me and when he did I dodged, and I drug out my knife and ran at him.    I thought he had a knife, it looked to me like he did, when he was cursing coming up."    Q.    You say, Mr. Day, it looked to you like he had a knife?    A.    Yes, sir, he had his hand shut, and was close to me.    I couldn't tell what was in it; looked like he was going to jump on me there against the house, and then is when I stepped back.    Q. What impression did you have in your mind?    A.    Why, I was expecting, looked like he was going to kill me, looked like, I saw death was my portion; he was much larger than me; I didn't see nothing except death, he was much larger than me.    Q.    You say you thought he had a knife or weapon?    A.    Yes, sir, he had his hand shut; I am satisfied he had something in it.    I *taken it to be a knife.*"    As a matter of fact it appears from the testimony of the other witnesses that Wren had no knife or weapon of any sort in his hand.    He may have had a cigar.    The electric light seems to have been shining brightly enough to enable the witnesses to see clearly what happened.    Mr. Day does not deny that when he got up from the tool chest he pulled his knife from his pocket and opened it behind his back, and that he rushed

upon Wren and began to cut and stab him forcing him
back on a truck, near which he fell and died in a few
moments—facts which were testified to by other witnesses. He does not say he saw a weapon in Wren's
hands, or that he saw Wren trying to draw a weapon
previous to or at the time when he began cutting Wren.
He makes much of Wren's being the larger man, and
yet it does not appear that Wren ever struck him with
any sort of severity, if he ever struck him at all. Under
these circumstances we are not satisfied that the trial
judge erred in refusing to give the requested instructions on self defense.

The ninth assignment of error is based on the following portion of the general charge to the jury given
by the trial judge: "The presence of the defendant's
family in court has nothing to do with the facts of this
case, and in making up your verdict you should not permit their presence to have any influence whatever upon
you." No authority is cited in support of this assignment. The giving of cautionary instructions is necessarily a matter very much within the discretion of the
trial court. An instruction that the jury in arriving at
their verdict should not be influenced by any feeling of
sentiment, but that they should apply the law, as given
them by the court, to the facts of the case is proper,
(Hughes on Instructions to Juries, § 49) and the charge
objected to is in line with this doctrine. Lindsey v.
State, 53 Fla. 56, 43 South. Rep. 87; Adams v. State,
28 Fla. 511, text 554, 10 South. Rep. 106.

The tenth assignment is based on a portion of the
general charge dealing with the question of premeditation. As the defendant was not convicted of murder
in the first degree, and as the evidence, in our opinion,
was such as would sustain the jury in a finding of murder in the second degree, it is not necessary to review
the matter presented by this assignment. Richard v.

State, 42 Fla. 528, 29 South. Rep. 413; Mathis v. State, 45 Fla. 46, 34 South. Rep. 287.

What is said above in regard to the tenth applies to the eleventh assignment. It objects to a portion of the general charge relating to premeditated design, and with what constitutes murder in the first degree.

We discover no reversible error in the record, and the judgment of the court below is affirmed at the cost of the county of Hillsborough.

TAYLOR and PARKHILL, JJ., concur;

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, JJ., concur in the opinion.