## LYLES *v.* THE STATE.

1. Motions for continuances are addressed to the sound discretion of the trial court; and the ruling of the judge below upon the question will not be disturbed, unless it appears that the refusal to grant the continuance was an abuse of his discretion.
2. A similar rule applies when applications are made for a postponement of the hearings of motions for new trials.
3. The court below did not err in excluding from evidence certain declarations of the accused, offered as a part of the res gestæ, it not appearing that they accompanied the act or were so nearly connected therewith in time as to be free from the suspicion of device or afterthought.
4. It is within the discretion of the trial court to permit the solicitor-general to propound leading questions to a witness introduced by the State.
5. It is not error for the judge in his charge to the jury to give cautionary instructions tending to impress upon them the gravity of the issues involved, where nothing is said in such instructions tending to prejudice the rights of the defendant or in any way to impress the jury with the idea that it is more important to vindicate the law by the conviction of the accused, if guilty, than it is to acquit him, if innocent.
6. The plain meaning of the defendant's statement being that he accidentally fired the shot that killed his wife, the judge did not err in stating to the jury in his charge that there was "no denial that the homicide was committed, and that the defendant, Lyles, took the life of the deceased."

7. No material error was committed by the court in charging the jury as follows: "The defendant in this case, while he admits the killing, says it .was the result of an unavoidable accident, and says, therefore, he .should not be convicted." While the expression "unavoidable accident" was not used by the defendant in his statement, the entire theory of the defense as shown by the statement was that the homicide was the result of an accidental discharge of the gun, without fault, evil design, or intention upon the part of the accused; and that theory of the defense appears to have been fully submitted to the jury, when the preceding extract from the charge is read in connection with what follows.

8. Where there is some evidence to show the existence of a certain state of facts, it is not error for the court to charge in reference thereto simply because the great preponderance of evidence tends to show that the supposed state of facts did not in truth exist.

9. Neither the evidence in the case nor the statement of the accused would have authorized the jury to convict the defendant of the offense of involuntary manslaughter in the commission of a lawful act without due caution and circumspection; and therefore the court properly refused to charge the jury in reference to that subject.

10. The evidence authorized the verdict; and no errors of law having been made to appear in any of the court's rulings in the trial of the case, nor in any of those portions of the court's charge upon which error was assigned, the judgment refusing a new trial will not be disturbed.

Argued October 21, 1907.—Decided March 6, 1908.

Indictment for murder. Before Judge Parker. Ware superior court. June 15, 1907.

Lyles was indicted, tried, and convicted for the murder of his wife, Eula Lyles. The evidence discloses that on the evening of January 30, 1907, the wife and infant child of Lyles were shot by the defendant on the front porch of the house where they lived in the city of Waycross, Ga., the wife dying immediately, and the child within a few hours. The defendant together with his wife and baby had just returned to their home, bringing with them a double-barreled hammerless shotgun which defendant had previously loaned to a friend, and which had been returned to him. There were no eye-witnesses to the tragedy. It was claimed by the defendant that the shooting was accidental, and that it occurred in the manner set forth in the sixth and ninth divisions of the opinion. It was contended upon the part of the State, that Lyles had been drinking, and had made certain threats against his wife, who desired to leave Waycross and return to the home of her mother in Colquitt county, and that the defendant intentionally

shot and killed his wife.  After the jury had returned a verdict of guilty, the defendant moved for a new trial, and excepts to the judgment overruling his motion.

*J. L. Sweat* and *John T. Myers,* for plaintiff in error.

*John C. Hart, attorney-general, John W. Bennett, solicitor-general, W. W. Lambdin,* and *W. W. Osborne,* contra.

BECK, J.  (After stating the foregoing facts.)

1.  On April 23, 1907, the defendant, Lyles, was put upon trial in the superior court of Ware county under an indictment charging him with the offense of having murdered his wife.  The jury trying the case, after remaining out for some time, reported to the court their inability to agree upon a verdict, and an order was granted declaring a mistrial.  On May 1, during the same term of the court as that at which the mistrial had been declared, the case against Lyles was again called for trial, when the defendant's counsel submitted a motion for a continuance, based largely upon prevailing conditions, and insisting that the case go over until such future time as that a fair and impartial trial of the defendant could be had. . Instead of granting the continuance until the next term of the court, the presiding judge adjourned the court until May 13, 1907, and on May 14 the trial of the case was again entered upon.

As a part of the motion for continuance made on May 1, in order to show the existence of conditions unfavorable to the defendant and prejudicial to his case, there is a narrative of what is alleged to have been a sensational scene in the court-house at the time the mistrial was declared; and further there are set out at length certain sensational articles appearing in the newspapers, as well as interviews and statements made by the solicitor-general of the circuit relative to the case and trial, all of which, counsel for movant insisted, rendered it "highly improbable for the defendant at this time to have what the law guarantees to him, a fair and impartial trial."  Another ground of the motion for continuance was that the "defendant's leading and chief counsel who had the preparation of the case and its management and direction in hand since the appointment and employment of counsel, Judge Myers only being associated with him during the immediate trial of the case, is now physically unable to proceed with another trial of the case at this term of court."  Upon hearing the motion the

same was refused, and the presiding judge adjourned said court until May 13, and on May 14 proceeded with the trial, as above stated. It does not appear that when the court convened on May 13, nor on May 14, when the case was called for trial, any further motion for continuance was made or insisted upon, but, on the other hand, it does appear that the defendant's counsel announced ready. Motions to continue cases are addressed to the sound discretion of the court; and when a motion of this character is made and is overruled by the trial court, this court will not interfere with the decision of the judge below, unless a flagrant abuse of his discretion is made to appear. *Oglesby* v. *State,* 121 *Ga.* 602 (49 S. E. 706) ; *Rawlins* v. *State,* 124 *Ga.* 31 (52 S. E. 1). No abuse of discretion on the part of the judge who heard and passed upon the motion for continuance is made to appear in this case. Excitement in the public mind, or prejudice against the prisoner at the time of the making of the motion, was not shown, but we are left to infer it from the nature of the articles and interviews published and the description of the scene in the court-house, without any other evidence whatever. And even if there was such excitement and prejudice against the prisoner and his cause in the minds of the public at the time the motion was made as would have required a continuance of the case, there is nothing in the record to show that it had not subsided when the case was ordered to trial on the 14th of May. And even if the showing as to the physical condition of the leading counsel for the defendant, at the time the motion for continuance was made, was such as to render it the duty of the court then to continue the case, it is not suggested in the motion for a new trial that the counsel had not recovered his health and strength, or that he was any longer unable to proceed with the trial. Had it appeared on the 14th of May that the leading counsel for the prisoner was sick and physically unable to manage the case of his client, we have no doubt that further time for the recovery of his health and strength would have been allowed. This ground of the motion is completely disposed of by the rulings in the cases cited above.

2. After the rendition of the verdict finding the defendant guilty, the motion for a new trial was made, and was set for hearing on the 15th of June. When the motion for a new trial was taken up for hearing, counsel for the movant asked for a con-

tinuance of the hearing, on the following grounds: (1) "Be-
cause of the absence of defendant's counsel, the brief of evidence
in said case . . and the charge of the court .. . were not
obtained by said counsel until the 7th or 8th of June, 1907; and
the regular term of the city court of Waycross, presided over by
Judge J. T. Myers, and in which court J. L. Sweat was of coun-
sel in several cases, having convened on June 10th, 1907, and
having continued in session until the afternoon of June 13th, said
counsel have not had sufficient opportunity and time within which
to carefully read and consider the brief of evidence and charge of
the court by this date, with a view of ascertaining whether or not
the same is correct." (2) Because the brief of evidence, although
approved by the court, has not been read either by the court, coun-
sel for the State, or counsel for the defendant, so as to ascertain
whether or not the same is correct. (3) Because defendant's coun-
sel have received information that certain of the jurors who tried
said case were not competent to try the same, and for want of time
said counsel have not had a "sufficient opportunity to investigate
and verify said information." (4) Because counsel for the de-
fendant, for all the reasons stated, have not had sufficient time
within which to perfect said motion for new trial so as to have the
same heard at this time, and (5) have not had a sufficient oppor-
tunity to prepare upon the law of the case so as to properly argue
the same before the court at this time. Thereupon the judge hear-
ing the motion passed the following order: "Defendant's counsel
having been personally notified of the filing of the brief of evi-
dence and charge of the court on June 3d,—two weeks before this
motion for continuance was made, and, in the opinion of the
court, having had ample time and opportunity to make all neces-
sary preparation for the proper consideration of the matter for
new trial, upon hearing had, this motion for continuance is over-
ruled." And error is assigned upon the refusal of a continuance
of the hearing. This exception is without merit, when the mo-
tion is considered in connection with the explanation made in the
order overruling the motion for continuance. Certainly it can
not be said that the judge had abused the discretion with which
he is vested in passing upon questions of this kind as completely
as he is when passing upon a question of continuance of a case
when it is called for trial before a court and jury.

3. Error is assigned because the court erred in repelling the testimony of the witness Emmett McElreath, to the effect, that, immediately upon hearing the shots fired, the witness and Mr. Pollard "walked around about sixty yards in front of Lyles' house, passed the gate, that the defendant was seen stooping over, and he raised up and made this exclamation, 'Gentlemen, come in here; my God, I have shot my wife.'" It is contended that this evidence should have been admitted as a part of the res gestæ. In the case of *Hall* v. *State*, 48 *Ga.* 607, it was said: "The res gestæ of a transaction is what is done during the progress of it, or so nearly upon the actual occurrence as fairly to be treated as contemporaneous with it. No precise point of time can be fixed *a priori* where the res gestæ ends. Each case turns on its own circumstances. Indeed, the inquiry is rather into events than into the precise time which has elapsed." And the Penal Code itself provides that "Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of *res gestæ.*" §998. Tried by these rules, the proposed evidence was not a part of res gestæ, and the judge who repelled the evidence might well have held that it was not free from the suspicion of afterthought. This is made clear when we take into consideration the testimony of the witness preceding that stage of the examination when it was sought to elicit the proposed testimony, the exclusion of which is here made the ground of complaint. It appears that the witnesses McElreath and Pollard were together. The time elapsing between the first shot heard by these witnesses and the time Lyles made the statement sought to be introduced as a part of the res gestæ may be judged from the testimony of the witnesses themselves. From that testimony it appears that when they heard the first shot they immediately stopped, and, as McElreath himself said, "We kinder hesitated, and maybe spoke a word or two,—I don't remember. Then we heard another shot, and heard something like—I thought somebody had shot a fice dog. It was a kind of whining. I did not hear that whining when the first shot was fired." After the two shots, the two witnesses stood still until Pollard suggested that they "go down there." To reach the scene of the shooting, it was necessary for them to retrace their steps along Miller street to Eads street, a

distance of about twenty steps; thence they went along Eads street to Lyles' house, a distance of about one hundred and eighty feet. Before they reached Lyles' house they had walked slowly a distance of some two hundred and forty feet. This would have required something like a minute or a minute and a half. When they reached Lyles' house they saw him moving about on the porch, but perceived nothing to indicate the occurrence of the deed of violence which had been perpetrated. Lyles was moving about on the porch in a stooping posture, as if searching for some object on the floor. The witnesses proceeded slowly along Eads street until they had passed the gate that led into Lyles' house, about twenty feet, and then they discovered the feet of the woman who had been killed. Upon making this discovery they stopped and started to go back into the house, where they perceived Lyles with a gun in his hands which he was in the act of unbreeching. All of this occurred before Lyles uttered the words which counsel for plaintiff in error say should have been admitted as a part of the res gestæ. In view of the rule laid down in the cases referred to, we can not say that the judge erred in repelling the testimony. It may be well, in this connection, to repeat what was said in the case of *Futch* v. *State,* 90 *Ga.* 472 (16 S. E. 102), "To except a statement from the rule which excludes hearsay, it must be not merely contemporaneous with the act, but also 'free from all suspicion of device or afterthought.' Code [1882], §3733. As was said by Bleckley, Chief Justice, in *Travelers Insurance Co.* v. *Sheppard,* 85 *Ga.* 775 [12 S. E. 26], 'What the law altogether distrusts is not after-speech but after-thought. . . That they [the declarations] shall appear to be spontaneous is indispensable, and it is for this reason alone that they are required to be speedy. There must be no fair opportunity for the will of the speaker to mould or modify them. His will must have become and remained dormant, so far as any deliberation in concocting matter for speech or selecting words is concerned. . . His declarations must be the utterance of human nature, of the *genus homo,* rather than of the individual. . . If the state of his mind be such that his individuality is for the time being suppressed and silenced, so that he utters the voice of humanity rather than of himself, what he says is regarded by the law as in some degree trustworthy.' Although this statement may have been made within a minute

after the shooting, the manner in which it was made was indica-
tive of at least some degree of afterthought." See also the case
of *Warrick* v. *State*, 125 *Ga.* 133 (53 S. E. 1027), where Lumpkin,
J., collects and discusses the cases bearing upon the question
under consideration.

What we have said above applies with equal force to the as-
signments of error in the sixth, seventh, eighth, ninth, and tenth
grounds of the motion for a new trial, and renders any extended
discussion of the reasons for overruling those grounds unnecessary.
Clearly the testimony of the witness Pollard which was excluded
was rightly repelled. That testimony, as set forth in the sixth
ground of the motion, is as follows: "That said witness, W. H.
Pollard, with the witness Emmett McElreath, immediately upon
hearing the shots fired, walked around and in front of the house
where the defendant, Lyles, lived, within a minute's time, and,
just as they had passed the gate, heard the exclamation made by
the defendant Lyles from his porch, 'My God, my God, come in
here; I have shot my wife,' or, 'Come in here, gentlemen; my God,
I have shot my wife,' and that upon going in and upon the porch
and within a half minute's time that he heard the defendant state
that the shooting was accidental, in response to a question from
witness as to how it occurred." The exclamation, "My God, my
God, come in here; I have shot my wife," or, "Come in here,
gentlemen; I have shot my wife," was the same as that to which
the witness McElreath proposed to testify, and can not be held to
have been illegally excluded, for the reasons which we have given
above. And for stronger reasons, the statement made by the de-
fendant, that "it was accidental," was objectionable, because it
was a mere narrative and a self-serving statement made "in re-
sponse to a question of the witness as to how it occurred."

Reasons similar to those which we have offered for holding that
the evidence of Pollard and McElreath was inadmissible apply to
the rulings made by the court upon the admissibility of the testi-
mony of McClelland, Daniel, and Davenport, as set forth in the
eighth, ninth, and tenth grounds of the motion, respectively.

4. Error is assigned because the court allowed the solicitor-
general, in examining the State's witness, Hunt, before the jury,
to propound to the witness the questions, "Did he not call his
wife a fool in your presence?" and, "Did he state anything fur-

ther?" which questions were objected to on the ground that they were leading and improper. We do not discover anything improper in the questions set forth, and it was in the discretion of the court to allow leading questions.

It was further insisted in this same ground of the motion that the court committed error, when, in response to this statement of the solicitor-general, "I am going to ask permission of your honor to interrogate this witness again, and ask that question; your honor sees I have an unwilling witness," he said, "Go ahead and ask the question." Counsel for the defendant insist that this was erroneous, "because Hunt was not only a State's witness, but apparently a most willing witness for the State, and said question, remark, and ruling tended to give undue weight to the evidence of said witness and to prejudice the defense." We do not think that the remark or ruling of the court was erroneous for any of the reasons assigned. The court made such a disposition of the matter brought to his attention by the question, statement of the solicitor-general and the objection, as was clearly within his discretion. If the statement made by the solicitor-general had been untrue in point of fact, or if there was any impropriety in it, tending to injure the defendant's cause, the impropriety might have been pointed out to the court, and no doubt the judge would have removed any hurtful effect of the same by giving to the jury the necessary prophylactic caution.

5. The court charged the jury as follows: "You have been empaneled to try a most important issue, in fact it is one of the most important issues that can be committed to a jury. It is one of vital importance to the accused, because with him it is a question of life or death or imprisonment in the penitentiary for life. It is a question of no less importance to the public, by its laws, to protect its citizens in the enjoyment of their lives, their liberties, their reputations, and their property. It is in return for this protection that the citizen owes obedience to the government. The protection which the law provides for you and your families, even while you are asleep, can only be afforded to you by a rigid and impartial enforcement and vindication of the law." The error complained of consisted, as counsel for the accused contends, "in the improper statement of the issue for which the jury had been empaneled to try said case, and for the reason that said

issue not only involved the rendering of a verdict of guilty, carry-
ing with it the death penalty or imprisonment in the penitentiary
for life, but the acquittal of defendant under his plea of not guilty.
And moreover, in view of the excitement and prejudice claimed
by the defense to exist, said charge was calculated unduly to im-
press the jury with the belief that it was their duty under all the
circumstances to convict the defendant." However subject to the
criticism made upon this excerpt from the charge it might have
been, standing alone, the objectionable features were removed
when the court added immediately to the foregoing the following
caution: "This is accomplished just as truly in the vindication
and acquittal of one who is innocent as it is in the conviction and
punishment of one who is guilty." In the case of *Beck* v. *State,*
76 *Ga.* 452, it was said, "The eighth ground complains of the
manner in which the court presented the case to the jury; that he
spoke of the momentous issues involved in the case—on the one
hand, the good order, peace, and security of society; on the other,
the life and liberty of the defendant; but the court followed by
stating the precise issues involved in the case, and this was done
fully and fairly, and the jury were duly cautioned not to let prej-
udice, passion, or excitement deprive the prisoner of any rights
to which he was entitled. The statement complained of did the
prisoner no harm. A charge similar to this was approved by this
court in *Choice's* case, above referred to [31 *Ga.* 424]." See also
the case of *Vanderford* v. *State,* 126 *Ga.* 753 (55 S. E. 1025).

6. The court did not err in instructing the jury that there
was "no denial that the homicide was committed, and that the
defendant, Lyles, took the life of the deceased, Eula Lyles." The
plain meaning of the defendant's statement was that he acciden-
tally fired the shot that killed his wife; and while he insisted that
the killing was accidental, his statement nevertheless amounted to
an admission that he had committed the homicide. In part, the
statement was as follows: "I pushed the catch [the safety slide]
off the gun and started into the room. I had the gun up some-
thing like that [indicating that he had the gun in his right hand,
with the barrel extending upward above his head]. . . I turned
to go to the door to go in to make a light there. . . When I
turned to go there I had the gun up something in that shape [in-
dicating that he had the gun in his right hand, with the barrel

extending above his head]. I do not know exactly how I had it..
. . I made a step or two towards where she was. As I started,.
she got up and started towards me. We met somewhere between
the two doors. She asked me to take the baby, and raised the baby
up in her arms like that [indicating]. When she did I dropped
the gun down—I do not know how, but it fell down something·
in that shape [indicating that gun fell over until the barrel was.
about in a horizontal position, on a level with his shoulder]. I
was reaching my left hand for the baby when it [the gun] fell
over and fired. . . Mr. Pollard and Mr. McElreath and a couple·
of others came in. The next one that came, I think, was Newt.
McClellan. I told him it was accidental, and told everybody that
came. I hollered for all to come that I could. I told McClellan
to come. I told him it was an accident." That we have set forth.
the plain meaning of the statement, judging from a passage in.
the brief of counsel for plaintiff in error, is supported by the con-
struction placed by counsel themselves upon the words of the de--
fendant. Counsel in their brief say, "It is true that strong cir-
cumstances were proven tending to establish that fact, but that.
would make it a case of circumstantial evidence; and it is also true·
that in Lyles' statement to the jury it is claimed that the shot.
which killed his wife was accidentally fired; but the State's case,
as charged in the indictment, that the defendant Lyles, with malice·
aforethought, wilfully and intentionally shot and murdered his.
wife, was dependent solely upon circumstantial evidence." To·
sustain the assignment of error contained in this ground would in--
deed be trifling with justice.

7. The court charged the jury as follows: "The defendant in.
this case, while he admits the killing, says it was the result of an
unavoidable accident, and says, therefore, he should not be con-
victed," and "as to that, I charge you, gentlemen of the jury,.
that if you find that this contention upon the part of the defend-
ant is established by the facts and circumstances of this case, then
it would be your duty to acquit him." Counsel insist that this
was error, because it placed upon the defendant the burden of not.
only showing that the firing was accidental, but that it was an un--
avoidable accident, in order to entitle him to a verdict of acquittal.
Whether or not the defendant's statement can fairly be so con--
strued as to hold that he claimed the killing to have been the result

of an unavoidable accident, we do not think that any harm was done him by stating the contentions of the defendant as they appear in this extract from the charge; especially as the court subsequently in the charge instructed the jury as follows: "If, upon the contrary, you find that at the time of this shooting this defendant did not intend to shoot his wife; that he simply had his gun taking it home with him; that he loaded it, and that he had taken off the safety to put it up in that condition; and that his wife undertook to hand him the baby, and while he was reaching for it the gun accidentally fell over in position; and that unconsciously and unintentionally his finger struck the trigger and the gun fired off, and he killed his wife under those circumstances, then I charge you that it would be your duty to acquit the defendant, because he would not be guilty of the offense of murder."

8. There was some evidence in the case from which the jury would have been authorized to find that at the time of the shooting the defendant was in a state of intoxication, and the court in reference to this feature of the case charged the jury as follows: "It was the contention upon the part of the State that at the time of the homicide the defendant was in a state of intoxication. As to that, I charge you that drunkenness is no excuse for crime. The law does not permit a man to avail himself of his own vice and misconduct to shelter him from the legal consequences of his own acts." This portion of the charge was excepted to on the ground that it was unauthorized by the evidence in the case and tended to prejudice the defendant in the minds of the jury. We do not think that the charge was error for any of the reasons assigned.

9. We do not think that the court erred in refusing to charge the jury upon the subject of involuntary manslaughter. Counsel for plaintiff in error insist that under the evidence and the defendant's statement the jury would have been authorized to convict the defendant of the offense of involuntary manslaughter in the commission of a lawful act without due caution and circumspection, and submitted to the court a written request to charge, adapted to that theory of the case. Certainly nothing in the evidence would have authorized the charge requested, and we do not think that the statement of the defendant himself offers matter to which such a charge would have been pertinent. In the defendant's statement, immediately preceding that portion set forth in the sixth division

of this opinion, we find the following: "The gun was standing by the steps. I went to the steps and picked the gun up and loaded the gun at the steps, standing right in front of the steps. I put the shells in it and loaded it. We always left the gun in the house loaded ever since we lived there. This catch [indicating safety slide] is hard to work. I can't work it very well, and no lady could work it at all, and we always left the catch off the gun on account of her using the gun. It is perfectly safe with that off, so you don't touch the triggers anyway." If the defendant's statement were true, then he was guilty of no crime whatever. He was carrying the gun in a safe and prudent manner; he had arranged the safety slide provided for the purpose of leaving the gun in a condition to be used by his wife if the occasion arose, and he was going into the house when his wife started up and towards him, and she held the baby up for him to take it. When she did that, "he dropped the gun down," and "it fell" into a horizontal position on a level with his shoulder. The accused was in the act of reaching his left hand for the baby when the gun "fell over and fired." If all of this were true, considering the emergency under which the defendant acted at the time the gun was brought down or "fell down," the proposition that he should be punished as for a crime is only a little less than shocking. Suppose, as suggested by counsel for the State, that the court had charged the law of involuntary manslaughter, and the defendant had been found guilty of that offense, do we doubt that good ground would have been found here for an appeal to the court to grant a new trial?

The defendant by his own statement raises and emphasizes the theory that the killing of his wife was the result of an unfortunate accident unmixed with any evil design or intention. He particularized circumstances to show that he was free from fault, and his theory was duly submitted to the jury.

But if we have not correctly construed what the defendant said in his statement, and if under that statement he was entitled to a charge upon the law of involuntary manslaughter in the commission of a lawful act without due caution and circumspection, the failure to charge upon that subject was not harmful to the accused, because the court summed up the circumstances as they were stated by the accused to have been, and instructed the jury that if they believed the killing occurred in the manner and under the cir-

cumstances narrated by the prisoner, he would not be guilty of any crime. (See the last excerpt from the charge in the seventh division of this opinion.) If, under the facts as stated by the defendant, the jury would have been authorized to find him guilty of involuntary manslaughter, and the judge charged that if they believed the killing to have occurred in the manner and under the circumstances described by the accused it would be their duty to acquit, the charge was, upon that point, more favorable to the accused than he had a right to demand, and he will not be heard to complain. "Under the decision in *Hill* v. *State,* 41 *Ga.* 484, the omission by the court to charge on the subject of involuntary manslaughter in the commission of an unlawful act, based on the theory of an accidental discharge of the pistol, furnishes no ground for reversal, where the court charged that the same facts on which instructions as to involuntary manslaughter might have been based would result in the acquittal of the accused. Such charge was more favorable to the defendant than that which he complains was not given." *Johnson* v. *State,* 130 *Ga.* 27 (60 S. E. 160).

There were other grounds of the motion which we have not thought it necessary to discuss. In none of them was error upon the part of the trial court made to appear.

*Judgment affirmed. All the Justices concur.*