# Staunton

ERNA STEEL v. COMMONWEALTH.

September 17, 1931.

Present, All the Justices.

The opinion states the case.

*D. F. Kennedy*, for the plaintiff in error.

*John R. Saunders, Attorney-General*, and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General*, for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

The accused in this action is seeking to set aside the verdict of a jury whereby he was found guilty of murder in the first degree and sentenced by the court to confinement in the State penitentiary for a period of twenty-five years.

He assigns five errors.

(1) The action of the trial court in refusing to set aside the verdict of the jury because it was contrary to the law and the evidence.

The accused does not deny that on the afternoon of March

27, 1930, he shot and killed his brother, Ed Steel, but claims that he acted in self-defense. It therefore becomes necessary to review the evidence.

It seems that sometime prior to the shooting, Bennie Steel, another brother, had agreed with Ed Steel to trade him a victrola for four gallons of whiskey. The victrola was delivered to Ed but he only delivered to Bennie one gallon of whiskey. Around ten o'clock on the morning of the killing, Bennie and Erna Steel went to the home of the deceased for the purpose of obtaining the other three gallons of whiskey. Ed refused to produce the whiskey at that time, but did not deny the obligation and stated that he would pay for the victrola. Bennie demanded the return of the victrola and declared his purpose to take it with him. Angry words followed. On the same occasion there was a further altercation between Ed and Erna Steel over some potatoes.

Shortly thereafter Erna and Bennie Steel left the home of their brother and, presumably, went to the home of Bennie, where they obtained a half-gallon of whiskey and started back to the home of Ed to return this whiskey and again attempt to retake the victrola. On the way they met Hiram Cantrell and the accused stated to him that they were going to Ed's to get Bennie's victrola. Cantrell said: "You will have a fight or get into trouble," to which Bennie replied, "if I do I have got the difference," and pulled a pair of metal knucks out of his pocket.

When they reached Ed's home he refused to accept the return of the whiskey and prevented their taking the victrola, using some force in so doing. As the parties were leaving Bennie shook his fist at Ed.

Again failing in their purpose to obtain either the victrola or the balance on the purchase price, Erna and Bennie went to the home of Bepo Robinson, the brother-in-law of Bennie, for the purpose of borrowing a shotgun. Evidently Robinson feared a difficulty between the two brothers and Ed Steel,

for he adopted the strange expedient of refusing to lend them the gun, but stated that it would be all right for them to take it. Whereupon the accused went into the house and took the gun. Robinson got out of giving them any shells by saying that he did not have any, but on the stand he admitted that he did have some. After obtaining the gun they went to a store and Erna bought seven shells.

They then proceeded to a place where they could get some liquor, drank it, and later went to the home of Ed Steel. Hattie Steel, Ed's wife, informed them that he was not at home. Thereupon Bennie threatened to shoot out the windows in the house if they were not admitted. Erna took the gun from Bennie and went around to the front of the house and threatened to shoot the door down if it was not opened. Mrs. Steel, fearing for the safety of herself and her children, took them into a back room of the house. Sometime on this third visit she told Bennie not to say anything more to her husband about the victrola, that she would get him to pay for it.

In the meantime, Ed Steel had gone to Mullins' store, bought some articles from Mullins and borrowed his pistol for the purpose, as he stated, of killing a chicken. He left Mullins' store carrying a sack of chop on his back and in sight of his home met Bennie and Erna coming therefrom. Several persons saw the meeting and the witnesses for the Commonwealth testified that Bennie took the sack of chop from Ed's shoulder and at the same time took the pistol out of his pocket. Erna shot and Ed immediately fell with his hands in the air and Bennie stood over him with the pistol in his hand. A few minutes thereafter Ed Steel died.

The evidence for the defense tended to show that Bennie Steel helped Ed Steel lift the sack of chop from his shoulder and placed it against a pile of slab on the side of the road, that Bennie and Ed then sat down on the slab; that the accused came up with the gun under his arm; that Ed

jumped up and drew his pistol and the accused fired from the hip. James S. Groseclose testified that as he was driving his truck along the road a woman called to him: "Didn't you see him shoot him down?" That he at once went to the scene of the crime where he found Ed in a dying condition, lying with his head in Bennie's lap and both Bennie and Erna talking to him; that the sack of chop was lying in the road and he set it over on the side of the road by the slab so that he could get by with his truck.

There was other conflicting testimony, but the jury has decided the conflict against the accused, and there is ample evidence to support the verdict.

(2) The next assignment of error is based on the action of the trial court in excluding from the jury certain statements made by the accused and Bennie Steel shortly after the killing. The killing occurred in the sight of a number of witnesses, but none were near enough to hear what transpired between the accused and the deceased except Bennie Steel. Within a few minutes after the shot was fired several of these witnesses and some other persons appeared at the scene of the killing.

The evidence is not clear as to the sequence of events following the shooting. After Erna Steel shot his brother he threw the metal knucks in a garden near the road, where they were found later; he went down the road, how far is not stated but apparently not over 300 yards, met one Moran Cantrell and returned with him to the body of Ed Steel; at that time Bennie was holding Ed's head in his lap and talking to him; Erna then said to Moran Cantrell: "I had to do it, he drawed a pistol on me and I shot him," and pointed to the pistol lying in the road near Ed's body. Practically this same statement was made by either Bennie or Erna Steel to the witnesses Rosa Cantrell, R. R. Roberts, W. H. Roberts and James S. Groseclose as they came up. The accused contends that these statements made immediately

after the shooting and while the parties were laboring under the excitement caused thereby are admissible as spontaneous ejaculations and parts of the *res gestae*.

These statements were made by the accused and his companion subsequent to the shooting and in explanation of that prior act. Such declarations, in order to be admissible as a part of the *res gestae*, must be the spontaneous and impromptu outpourings of the mind, made while it was still under the influence that controlled or governed it at the time of the main transaction. 16 C. J. 575, and numerous cases there cited.

Even if the statements are spontaneous ejaculations made by the accused subsequent to the main act, some authorities hold that they are self-serving declarations and are inadmissible. *Thornton* v. *State*, 107 Ga. 683, 33 S. E. 673; *Lyles* v. *State*, 130 Ga. 294, 60 S. E. 578; *Richardson* v. *State*, 123 Miss. 232, 85 So. 186; *Day* v. *State*, 54 Fla. 25, 44 So. 715; *State* v. *Brooks*, 192 Ia. 1107, 186 N. W. 46; *State* v. *Moore*, 156 Mo. 204, 56 S. W. 883; *State* v. *Hildreth*, 31 N. C. (9 Ired.) 440, 51 Am. Dec. 369.

There are other authorities, including Wigmore on Evidence, volume 3, page 17, which hold that if the subsequent statements of the accused are spontaneous ejaculations or utterances made under the immediate and uncontrolled domination of the senses and before self-interest could have been brought fully to bear, then such ejaculations should be admitted as a part of the *res gestae*.

In the case of *Little* v. *Commonwealth*, 25 Gratt. (66 Va.) 921, in an opinion written by Moncure, P., one of the grounds of reversal was that the trial court had refused to admit or hear a statement made within a few minutes after the shooting by the prisoner charged with murder. The court stated that under the circumstances of that case it was not "probable that the prisoner had either time or motive to fabricate a statement," and that there were other

eye-witnesses who could disprove any misstatements which the prisoner made regarding it.

The difficulty arises in determining when the subsequent statements are spontaneous. As a general rule, it may be said that if it appears sufficient opportunity for the fabrication of a story has elapsed the statements will be rejected. The burden is on the accused to demonstrate to this court that the trial court erred in rejecting the statements.

Just when Erna Steel threw the metal knucks away does not appear.

The uncontradicted evidence shows that both Erna and Bennie Steel were determined to take possession of the victrola; both had made threats against Ed; they had been together from ten o'clock in the morning until sometime in the afternoon. The flimsy excuse given by the accused at the time he borrowed the gun, *i. e.*, that he wanted to shoot rabbits the latter part of March, and his behavior at the time, show his mental attitude toward the deceased. The five witnesses who, apparently at different times but very quickly after the shooting, came to the scene of the crime, on their arrival were told the same thing either by Bennie or Erna Steel. The repetition of the statement, the fact that the metal knucks were thrown away, and that the same statements were made by a companion who had been acting with the accused in the previous difficulties with the deceased, and the fact that Erna Steel had left the dying man and returned to him, indicate that the declarations were not spontaneous. On the contrary, they raise a strong suspicion that they were premeditated, rather than spontaneous. It follows that the accused has failed to demonstrate that the trial court erred in rejecting the declarations.

(3 and 4): The third and fourth assignments of error deal with the giving and refusing of certain instructions. The accused objected to the following instruction:

"(8) That the law of self-defense is the law of necessity and the necessity relied on to justify a killing must not arise out of the misconduct of the defendant; *Ernest* Steel, or anyone acting in concert with *Ernest* Steel and that the misconduct contemplated by law is not confined to the physical acts of the defendant or anyone acting in concert with him, but also contemplates, extends to and includes such violent and abusive acts, conduct, words or language as is well calculated to provoke a breach of the peace."

The ground of objection was that there was no evidence of the use of any violent or abusive language by the accused or Bennie Steel at the time of the killing, and that no distinction is made in the instruction between the prior difficulties and the one in which the killing occurred. The principle of this instruction, in almost the identical language, is found in the case of *Scott* v. *Commonwealth*, 143 Va. 510, at page 516, 129 S. E. 360. Several of the witnesses, including the wife of Ed Steel, testified that when they saw the brothers meet and Bennie take the bag off of Ed's shoulder, they thought a difficulty or fight would follow, and that they turned their heads or went into the house to keep from witnessing the difficulty.

That part of the instruction to which objection is made deals in a general way with the theory of self-defense, and if reference to abusive language had been omitted the instruction would have been unobjectionable. The jury were fully instructed on the law applicable to the case and when this general instruction is read in connection with instructions 6, 7 and 8 (set out in the footnote)[1] given at the request of the accused, it is evident that the slight amount of surplusage in the instruction did not prejudice the jury and that the giving of it does not constitute reversible error.

---

[1]"6. The court further tells the jury that a man when threatened with danger must determine from appearances and the actual state of things surrounding him at the time as to the necessity of self-defense, and if he acts

■ Objection is made to the action of the court in amending instruction 8 (see footnote) offered by the accused, by adding the words, "and that Erna Steel was without fault at the time on this occasion," and striking therefrom, "or if the jury have a reasonable doubt as to whether the killing occurred in that way and manner it is their duty to find the defendant not guilty." What was said in discussing Commonwealth's instruction No. 8 applies with equal force to the addition made by the court in this instruction. There were six other instructions dealing with, repeating and emphasizing the doctrine of reasonable doubt. Under the circumstances, it is inconceivable that the jury could have been misled by eliminating from this instruction a repetition of the same legal principle.

(5) The last assignment of error is to the language used by the Commonwealth's attorney in his closing speech to the

from reasonable and honest conviction he will not be held responsible criminally for a mistake in the extent of the actual danger where other judicious men might have been alike mistaken, for when one man attempts to injure another it gives the man attempted to be injured the right to make use of such means to prevent injury to himself as the behavior of his adversary and his own situation make necessary. The jury is further told that in this case they must view the evidence from the standpoint of the defendant at the time of the shooting, and if so viewing the evidence there is any rational hypothesis in this case consistent with the conclusion that the shooting was excusable or justifiable, they should find the defendant not guilty.

"7. The court further tells the jury that if they have any reasonable doubt as to whether the defendant acted in his own necessary self-defense, it is the duty of the jury to give the defendant the benefit of such doubt and find him not guilty; and that if there is a reasonable doubt in the minds of the jury as to whether the defendant was justified in shooting the deceased or not, the jury cannot legally find him guilty, but in such case it is the duty of the jury to give the defendant the benefit of such doubt and find him not guilty.

"8. The court instructs the jury that although they may believe from the evidence in this case that Erna Steel and Bennie Steel had a difficulty with the deceased on two different occasions during the day prior to the killing, yet if they further believe from the evidence that the defendant, Erna Steel, met the deceased on the public highway, and the said Ed Steel drew his pistol and made such a movement or demonstration with the same that it reasonably led the defendant, Erna Steel, to believe that the deceased intended to shoot him, and that Erna Steel was without fault at the time on this occasion; and that then the said Erna Steel raised up his shotgun and shot and killed the deceased, Ed Steel, the jury should find the defendant not guilty."

jury. The bill of exception on this assignment of error is as follows:

"Mr. Kennedy in his argument in this case said that Hettie Steel, the widow of Ed Steel, when she stated that she saw her husband and the other two Steel boys meet in the road that she went back in the house and through that room and into the kitchen to keep from seeing them shoot her husband. Mr. Kennedy criticized this statement of this widow woman and said that it was unreasonable and didn't bear the stamp of truth; that she would have gone to him instead of back in the house, and that she was warped and prejudiced against the defendant and he shed tears before the jury for his client. 'Oh! Dave, why didn't you shed a few tears for this widow woman and her six orphan children that are here today?' The Commonwealth's attorney stated: 'Oh! Dave, you never thought about this widow woman and her six orphan children who are sitting over there. You have great sympathy for the defendant and you can shed tears for the defendant but you never one time thought of this widow woman and her orphan children. Oh! Dave, why can't you shed a few tears for them? They are the ones that are entitled to sympathy. Oh! Dave, if your client had of stayed away from Ed Steel's house and left that old shotgun alone and had not gone up there this woman would not have been a widow today and her children would not have been orphans.'

"I object to that kind of argument and move the court to tell the jury not to consider it.

"No reply by the court, but the Commonwealth's attorney changed his line of argument."

■ This court has repeatedly held that it is error for counsel to unduly arouse the prejudice or passion of the jury in the trial of cases, and this is especially true of attorneys representing the Commonwealth in the prosecution of persons accused of crime. This principle was emphasized

in the case of *Parsons* v. *Commonwealth*, 138 Va. 764, 121 S. E. 68, 73, where it was stated that the Commonwealth "does not rely either upon prejudice or sympathy for the enforcement of its laws."

In that case the record did not show that an appeal for mercy or sympathy had been made to the jury in behalf of the accused. In the case at bar, the exception shows that the widow of the deceased had been vigorously attacked by the counsel for the accused, and the prosecution was replying to this attack. While the language used had a tendency to unduly arouse in behalf of the widow the sympathy of the jury, the provocation was great. Notwithstanding the provocation, when exception was made the court should not have remained silent and allowed the language to go unrebuked. The attitude of this court on the intemperate remarks of counsel, not warranted by the evidence, was reiterated in the case of *Dingus* v. *Commonwealth*, 153 Va. 846, 149 S. E. 414.

In view of all the evidence and the full and carefully worded instructions given by the court, our conclusion is that while the strong language of the Commonwealth's attorney, in another case, might constitute reversible error, in this case it was harmless.

For the reasons stated, we are of opinion that the record does not disclose any reversible error, and the judgment of the trial court should be and is affirmed.

*Affirmed.*

EPES, J., dissenting.

I do not concur in the conclusions reached by the court in its opinion; and without undertaking to write a finished opinion, shall state as briefly as practicable my reasons for dissenting.

The evidence tends to show that both killer and killed were bad actors; and that, following an altercation which

had taken place between them earlier in the day, each had armed himself in anticipation of further trouble with the other. While these facts must be borne in mind and given their due weight in the determination of the law applicable to this case, they give no license to the killer to kill, nor do they of themselves place him in a position in which he could not have legally killed in defense of himself.

Only by rejecting the testimony of Ernest Steel and Bennie Steel as unworthy of belief, even when not directly contradicted by the testimony of any other witness, can conviction be sustained. This makes it very material that no evidence of probative value bearing on the truth or falsity of their testimony should be excluded. The statements made by Bennie or Ernest Steel to Moran Cantrell and several other persons soon after the killing, which were excluded by the court, may be too far removed in time and circumstance from the killing to have probative value. But I think the statements to which James H. Groseclose testified bear the earmarks of having been spontaneous and impromptu outpourings of the mind of Ernest Steel, made while it was under the influence that controlled and governed it at the time the fatal shot was fired, have real probative value, and should have been admitted in evidence.

The court certifies that the evidence of Groseclose which was excluded was as follows:

"I was about 200 feet away when Erna Steel shot Ed Steel. I was driving my truck along the public highway and a woman ran out to her yard fence waving her hand and pointed and said didn't you see him shoot him down. I looked and saw Bennie Steel and Erna Steel stoop down and raise Ed Steel's head and shoulders up. Bennie Steel took his head and shoulders in his arms and lap and they were both Bennie Steel and Erna Steel was talking to Ed Steel and rubbing his face and trying to minister to him. I got out of my truck and went to where they were and Erna

Steel said I had it to do, he jerked his pistol and started to shoot me and I shot him. Said, don't you see there is his pistol lying there, and I looked and in about eighteen inches of the body of Ed Steel and saw a pistol laying in the road and a pint bottle about half full of something which I took to be whiskey laying near the pistol."

Groseclose was only 200 feet (not 300 yards) distant at the time of the shooting; and to me the irresistible inference from the evidence is that he arrived at the scene and heard these utterances of Ernest Steel within a fraction of a minute after the shot was fired, and before it is probable that Ernest Steel had had time to fabricate a defense. I find nothing in the evidence to suggest that the statement made to Groseclose was made after Ernest Steel had left the immediate scene of the shooting or had thrown away the knucks.

In this connection it is pertinent to note that I find no direct evidence in the record that Bennie Steel took the pistol out of Ed Steel's pocket either at the time he took the bag of chop from his shoulder or at any other time.

Okley Stanley testified: "Bennie took the sack of chop off of Ed's shoulder and as he took chop off his shoulder he put his hand on Ed's pocket, and I turned my head and heard a shot; and when I looked back I saw Ed falling with his hands stuck up and Bennie standing with pistol in his hand."

Hattie Stanley testified: "Bennie took a bag of chop off of Ed's shoulder and I thought they were going to have a fight and I turned and walked into the house. After I went into the house, I heard a gun fire and I went back out on the porch and I saw Ed falling with both hands up, and immediately after Ed fell Bennie was standing over Ed with a pistol in his hand."

This is all the evidence which I find to support a finding that Bennie Steel took Ed Steel's pistol out of his pocket at any time, or to contradict the testimony of Bennie and

Ernest Steel that Ed drew his pistol on Ernest Steel before Ernest fired.

It is also to be noted that all who claim to have been eye witnesses of what took place were from 250 to 300 yards distant, and this evidence shows that they saw but imperfectly what happened. The undisputed physical facts testified to by a witness for the Commonwealth show that the shooting was done at close range (the wound made by the load from the shot gun was only about as large as a dollar), and that the shot ranged upward. This tends strongly to support the statements of Bennie and Ernest Steel that Ernest Steel fired from his hip.

Under the facts in this case, I think the court erred in giving instruction No. 8 which is fully set forth in the opinion of the court.

Earlier in the day there had been a difficulty between Ed Steel on the one hand and Bennie and Ernest Steel on the other, which the evidence tends to show arose, in part at least, out of the misconduct of Ernest Steel, at which time Ernest and Bennie Steel had used violent language. But this transaction had terminated; and the misconduct of Ernest Steel on that occasion did not operate to take away from him the right of self-defense at the time the shooting occurred.

Instruction No. 8 is so framed that the jury might well have understood therefrom that the misconduct of Ernest Steel at the time of the earlier difficulty deprived him of the right to shoot in self-defense at this later time. There is no testimony that Bennie or Ernest Steel used violent language at the time of the shooting, but there was much testimony as to the use by them of violent language on the prior occasion; and the reference to violent language in the instruction may well have led the jury to understand that the court had told them that if the necessity for the killing was a consequence of the misconduct of Ernest Steel on the former occasion he could not shoot in self-defense.

I do not concur in the view of the court that in this case the other instructions given rendered the error in instruction No. 8 harmless error.

I fully concur with the court in its view that the argument of the Commonwealth's attorney was very improper; but I am further of opinion that under the evidence in this case the court committed reversible error in permitting the Commonwealth's attorney to appeal thus to the sympathy and emotions of the jury and to attempt to arouse their passion and prejudice against the accused.

For these reasons I think the judgment of the court should be reversed.