KING *v.* THE STATE.

</div>

1. The testimony referred to in the corresponding division of the opinion was relevant.

2. A certain overcoat found at the scene of the homicide was sufficiently identified as the coat of the defendant to authorize its admission in evidence.

3. It was erroneous to charge the jury: "The defendant enters into the trial of this case with the presumption of innocence in his favor, and that presumption remains with him until the minds of the jury are satisfied beyond a reasonable doubt that he killed J. E. McNair." The defendant was entitled to the presumption of innocence throughout the trial, which could only be overcome by proof of his *guilt of the crime alleged* beyond a reasonable doubt.

4. The court charged: "Whether dependent upon positive or circumstantial evidence, the true question in all criminal cases is not that the conclusion to which the evidence points may be false, but whether or not the State has satisfied the minds and consciences of the jury beyond a reasonable doubt of the guilt of the accused." This charge is excepted to as not being a true statement of the law as declared in the Penal Code (1910), § 1013, which employs the language: "The true question in criminal cases is, not whether it be possible that the conclusion at which the testimony points may be false, but whether there is *sufficient testimony* to satisfy the mind and conscience beyond a reasonable doubt." The charge was inaccurate.

---

Criminal Law, 16 C. J. p. 536, n. 62; p. 553, n. 72, 73; p. 620, n. 54; p. 942, n. 76; p. 977, n. 53; p. 990, n. 93; p. 1002, n. 17; p. 1011, n. 25; p. 1016, n. 85; p. 1019, n. 26; p. 1061, n. 61; 17 C. J. p. 212, n. 18.

Homicide, 30 C. J. p. 364, n. 83; p. 396, n. 23.

5. The court did not err in its charge on the subject of alibi for any reason assigned as indicated in the fifth division of the opinion.

6. The charge set out in the sixth division was not erroneous for any of the reasons assigned.

7. The charge relating to the defendant's statement before the jury, while inaccurate in some respects, does not show cause for reversal for any reason assigned.

8. The charge set out in the eighth division, relating to circumstantial evidence, does not furnish cause for reversal for any reason assigned.

9. It was not error to charge: "There has been some evidence introduced before the jury on the subject of impeachment by contradictory statements; and on that principle I charge you that a witness may be impeached by proof of previous contradictory statements made relative to matters testified to by him and to the issues in the case. If the jury believes that any witness has been impeached by proof of contradictory statements to the satisfaction of the jury, and he has not been sustained by proof of his general good character, it is left with the jury to say just what weight or credit they will give to such witness, the jury alone being the judges of what witness they will or will not believe or whether or not a witness has or has not been impeached."

10. In the absence of a timely written request it was not erroneous to omit to charge on the subject of impeachment of witnesses.

11. The evidence in this case was insufficient to authorize a charge on the subject of confessions.

12. The assignment of error in which complaint was made of the charge relating to the form of the verdict was expressly abandoned during the argument in open court, and no ruling will be made with reference thereto.

13. Under the evidence in this case it was erroneous to charge: "Now, gentlemen of the jury, under the law of this State this killing is murder. There is no evidence before the jury of any character showing justifiable homicide or extenuation or mitigation, under the principles of law, which would reduce this killing from the crime of murder to any other lower grade of homicide."

No. 5346. December 15, 1926.

Murder. Before Judge Persons. Butts superior court. February 22, 1926.

Tom King and John Bell were jointly indicted as principals for the murder of J. E. McNair. Tom King was placed on separate trial. The jury returned a verdict of guilty, without a recommendation. The defendant made a motion for a new trial on the general grounds and upon special grounds added by amendment. The motion was overruled, and the movant excepted. The evidence tended to show that the homicide was committed under the following circumstances: McNair, being an arresting officer, accompanied by two other officers, about 9:30 o'clock at night went to the location of a supposed illicit distillery. The location was

on land of the mother of John Bell, at an abandoned sawmill site on the side of a branch. There was at the place a large pile of slab boards, a sawdust pile, a still, and a poplar tree, all on the left side of the branch going up stream. The tree was just above the still and at the edge of the branch. An old lumber road extended from the sawmill site up a hill. On Sunday night the officers found "two barrels of fermented beer" at the sawmill site. They did not find anything else in connection with the distillery at that time. They returned the following night "about first dark." When they got within seventy-five or one hundred yards they heard a wagon leaving the place. After the wagon had gone the officers approached the still site and found that "the stilling apparatus had been brought in and [partly] set up" and ready to build a fire around "the steamer." The officers retired to await commencement of operations. About nine o'clock one of the officers reported that he saw "them doing around, they have a big fire over there." The officers then approached the branch a short distance below the site and proceeded to walk practically abreast up the branch, McNair going on the left side and the other two officers on the right. As they approached the still a gun was fired seemingly toward them from behind the poplar tree, and a boy proceeded from the still to cross the branch, and was captured by the two officers who had gone up on the right. The sawdust and slab pile obstructed their view of McNair at the time of the shot, but they saw two other men running away from the still and going up the hill along the sawmill road. One of the officers testified that he recognized one of the fleeing men as the defendant Tom King, and that he saw Tom King run from behind the poplar tree, carrying a gun. One of the officers carried the boy a short distance to a fire, while the other proceeded immediately to examine the place by means of a flashlight. He did not know that Mr. McNair had been shot. However, he then discovered the lifeless body of McNair at the still with "his right hand across his breast and his thirty-eight pistol lying five or six inches from his hand, just out of his hand, like it had fell out of his hand as he fell." He had been shot one time at close range, so that the load of shot made one hole, having entered the left side of his face below the eye and passed through and lodged in the neck below the right jaw. About three hours later the sheriff went to the house of Tom King, arrested him, and carried him to jail in another county. The sheriff found in

the house Tom King's shotgun, the right-hand barrel of which seemed to have been recently fired. At or near the scene of the homicide was found an empty shell that corresponded to the gauge of the gun, also an overcoat which several witnesses testified resembled the coat of the defendant, and which was identified by them by reason of a patch it contained. A gun-wad taken from the wound inflicted by the shot also corresponded with the gauge of the gun. On the trial the boy testified that he and his brother were "possum hunting," and were attracted to the still by the light a few minutes before the homicide. When they got there they found Tom King, John Bell, and a white man standing around a fire. The white man left, saying, "I will see you boys later." Just as he left "Tom King said he was going to make us help them." The witness then proceeded: "My brother and I stayed around the fire, and Johnnie Bell told my brother to . . get a bucket of water, and he was chunking up, and my brother stooped to pick up a bucket, and Mr. McNair walked out; at that time we were around the fire. I had got one bucket full of water; they put it in the trough, in the far trough up towards the tree. I saw Mr. Jim McNair coming up, my brother saw him first before any of us; he says, 'Yonder comes a man.' At that time Tom King was up there about the fire. I was on one side and he on.the other. I had not seen anybody there before that time with a gun. I had not seen a gun there before that time. At that time Mr. Tom King raised up a gun and shot this way, and I turned off and run. He was pointing at Mr. McNair. · It was then that I ran. . . Tom King reached back behind him and got that gun. Tom King was standing up this way, and got out and throwed it up this way .to shoot, and the gun fired. I was down in the branch when he fired. I did not hear but one gun fired; that is the only explosion I heard." The boy had previously made statements contradictory to this testimony, and had sworn differently before the grand jury. There was no evidence tending to show the good character of the boy. There was no evidence that the officers had a warrant for the arrest of the defendant at the time of the homicide; or evidence other than as above stated, tending to show that the defendant had committed a crime in the presence of the officer. Other facts will sufficiently appear from the opinion.

     *Joel B. Mallet, W. E. Watkins,* and *H. M. Fletcher,* for plaintiff in error.

*George M. Napier, attorney-general, Frank B. Willingham, solic-
itor-general,* and *T. R. Gress, assistant attorney-general,* contra.

ATKINSON, J. 1. Grounds seventeen to twenty-two, inclusive,
complain of the admission of evidence. Referring to the time of
making the arrest of defendant at his home three hours after the
homicide, the sheriff was permitted to testify: "At the time I
told him to put on his clothes and come with me, he said, 'I can
prove by Mr. Walter Craig and Mr. Dock Torbet I have been here
all night.'" The objection urged was that this evidence was ir-
relevant, immaterial, and inadmissible, for the reason that it was
neither a part of the res gestæ nor a confession. The sheriff was
permitted to testify also: "I knocked at the door, and Tom said,
'Who is that?' and I said, 'Me,' and he opened the door, and I
said, 'All right, Tom, come ahead with me.' That is all I said.
He made no reply. The first statement Tom made was in Macon
the next morning." The defendant objected to this testimony and
moved to rule it out, on the ground that it was irrelevant and im-
material and was neither a part of the res gestæ nor a confession of
guilt, and was calculated to confuse the jury. The sheriff was
further permitted to testify: "On the trip to Forsyth Tom King
did not make any other statement to us. I did not disclose to him
on that trip what he was under arrest for, not until I got to Forsyth.
Mrs. Bittick was by herself, and I told her that he was charged
with killing county policeman Mr. McNair, and Tom did not say
anything at that time. He had said not a word on the trip from
Indian Springs to Forsyth, and he had not asked any questions
as to what he was being arrested for." The defendant objected to
this testimony and moved to rule it out, on the same grounds as
above stated. The sheriff was also permitted to testify: "I think
Mr. Thornton asked him when he had shot his gun, and he said
he went hunting on Friday and it hadn't been shot since. He said
he killed several rabbits on Friday, and he said it hadn't been fired
since that time." The defendant objected to this testimony and
moved to rule it out on the same grounds as above stated. A per-
son who aided the sheriff in making the arrest and carrying the
defendant to jail gave similar testimony to that delivered by the
sheriff as above indicated, which was ruled to be competent and ad-
mitted by the court over the same objections as were urged to the
admissibility of the testimony by the sheriff. The testimony did

not amount to a confession, but related to conduct and declarations by the defendant which had some relevancy to the issue on trial. This being so, the court did not err in admitting the evidence and in overruling the motion to rule it out.

2. The twenty-third ground of the motion for new trial complains of the admission in evidence of an overcoat alleged to have been found at the scene of the homicide. The evidence was admitted over the objection that "there was no direct evidence  . . that it was this defendant's overcoat." This ground is not sustained by the record. There was some evidence tending to show that the overcoat was the defendant's.

3, 4. The rulings announced in the third and fourth headnotes do not require elaboration.

5. On the subject of alibi the court charged: "The defendant in this case contends by way of his defense that he did not kill Mr. McNair, nor was he at the scene of the killing, and he therefore seeks to establish an alibi; and on the subject of an alibi, I charge you that alibi as a defense involves the impossibility of the prisoner's presence at the scene of the offense at the time of its commission, and the range of the evidence in respect to time and place must be such as reasonably to exclude the possibility of the presence of the accused. The burden is upon the accused to prove his alibi by reasonable evidence and to the reasonable satisfaction of the jury, before the jury would be authorized to find that an alibi has been established under the law. The jury may take into consideration all the evidence in the case, including the defendant's statement, and determine therefrom whether or not an alibi has been established as is provided by law. If the jury believes that the alibi has been established and it was physically impossible for the accused to have been at the scene of the crime, then the alibi would be complete in the law and the defendant should be acquitted by the jury." (a) The evidence and the prisoner's statement before the jury, considered together, were sufficient to authorize the charge. (b) The charge was not erroneous, as alleged, on the ground that it too strongly emphasized the burden upon the defendant, because it required the "accused to prove his alibi by reasonable evidence and to the reasonable satisfaction of the jury, before the jury would be authorized to find that an alibi has been established under the law;" or because it required the jury to "be-

lieve that the alibi has been established *and* it was *physically* impossible for the accused to have been at the scene of the crime" before "the alibi would be complete in the law *and* the defendant should be acquitted by the jury;" or because the charge was "tantamount to an instruction . . that the burden was upon the defendant to prove his alibi beyond a reasonable doubt;" or because "the same excluded the testimony of alibi, as it affected the question of reasonable doubt, unless the alibi be established and complete in law; whereas, by law, the accused was entitled to the benefit of a reasonable doubt produced in the minds of the jury by the consideration of all the evidence including that of alibi, . . while an alibi established under the law to the satisfaction of the jury, alone and of itself, demands a verdict of not guilty." (c) The charge was not erroneous, as alleged, "for the reason that the court failed to charge in connection therewith that the State was not relieved of the burden of proving guilt beyond a reasonable doubt to the satisfaction of the jury by the defendant offering evidence of alibi;" nor "for the reason that the court failed to charge in connection therewith and to instruct the jury upon the distinction between the burden upon the defendant to establish his alibi to the reasonable satisfaction of the jury and the burden of the State to prove guilt beyond a reasonable doubt to the satisfaction of the jury over and above and in spite of the defendant's failure to establish and complete in law an alibi, especially when the defendant's burden is emphasized in the above-quoted language, and the State's burden, it is insisted in ground No. 2 of within amended motion, is not sufficiently emphasized, since the presence of the defendant was necessary to constitute guilt, and a 'reasonable doubt of presence, by irresistible logic (and by law), involved a reasonable doubt of guilt;'" nor "for the reason that the court failed to instruct the jury, in connection therewith, that it was the duty of the jury to consider the testimony of alibi in determining whether or not there was a reasonable doubt of the guilt of defendant."

6. The court charged: "The defendant in this case contends by way of his defense that he did not kill Mr. McNair, nor was he at the scene of the killing, and he therefore seeks to establish an alibi." This charge was not erroneous for any of the following alleged reasons: (a) that it "expresses a conclusion from the evidence by the court;" (b) that it "did intimate and express a con-

clusion from the evidence that the defendant had sought to establish an alibi, and did intimate and express an opinion that the defendant had sought or attempted to establish an alibi and had not successfully done so;" (c) that it "did intimate and express an opinion to the jury that the contention of defendant that he was not at the scene of the killing had not been established or proven by the defendant;" (d) that it "did intimate and express an opinion to the jury that the defendant's seeking to establish an alibi amounted to nothing more than an attempt;" (e) that it "tends to discredit and disparage the evidence introduced by defendant (including his statement) under his plea of not guilty."

7. The court charged: "The defendant has made his statement in his own defense, which he has a right to do. This statement is not under oath, he is not subject to prosecution if he does not speak the truth, and he can not be cross-examined. If you believe his statement is true, then the jury may accept his statement in preference to the sworn evidence in the case, either in whole or in part. If the jury does not believe his statement is true, then it is the duty of the jury to reject his statement." This charge was not cause for reversal on the grounds as alleged: (a) it "tends to discredit and disparage defendant's statement, in error of law;" (b) that "the statement in said charge, 'he can not be cross-examined' is contrary to law, for the reason that the defendant may be cross-examined, although he shall not be required to answer any questions on cross-examination should he think proper to decline; and whereas the State did not indicate any desire or willingness to cross-examine defendant and defendant did not decline to answer any question on cross-examination, any reference to the rule of law as to the cross-examination of the defendant was erroneous and prejudicial to defendant;" (c) that "it precluded and excluded the statement having 'such force as the jury may think right, to give it;'" (d) "because the court failed to charge or instruct the jury in connection therewith that the jury may give such weight to defendant's statement as in their judgment it may be entitled to;" (e) that the charge "instructed the jury that if the jury did not believe any part of the statement of defendant, then it was the duty of the jury to reject it entirely and entirely disregard it;" (f) that the charge "instructed the jury that no part of defendant's statement may be accepted by the jury

in preference to the sworn testimony unless the jury believe that the statement is true in its entirety, and precludes and excludes the jury from accepting a part of his statement in preference to any or all of the sworn testimony in the case, which, by law, the jury may do;" (g) that the charge "instructs the jury to reject and disregard entirely defendant's statement, unless the jury believe the statement to be true in whole and in part; whereas, under the rules of law governing the weight of defendant's statement, the jury may give it such weight or force as they think right to give it, and may take it for any light it might shed upon any issue in the case, even though the jury disbelieves the statement or does' not believe a part or parts of the statement to be true."

8. The court charged: "I charge you, gentlemen of the jury, that if you believe . . there is circumstantial evidence in this case which has a bearing upon the issues of this case, . . before a conviction could result from circumstantial evidence it would be necessary that the facts as proven be consistent with the hypothesis of guilt and should exclude every other hypothesis other than that of the guilt of the defendant." This charge is not cause for reversal on any of the following alleged grounds: (a) that it "instructs the jury contrary to the rules of law as set out in section 1010, Criminal Code of Georgia, governing conviction upon circumstantial evidence in criminal trials, which said rules provide that 'To warrant a conviction on circumstantial evidence, the proved facts *must not only* be consistent with the hypothesis of guilt, *but must* exclude every other hypothesis save that of the guilt of the accused;' " (b) "for the reason that the language used by the court did intimate and express an opinion to the jury that the State's case did not rest upon circumstantial evidence, or that the State did not, in the opinion of the court, rely upon circumstantial evidence; whereas defendant, movant herein, insisted that the only two witnesses for the State who gave any positive testimony that defendant was even present at the scene of the killing had been successfully impeached, both by contradictory statements, one by false testimony before the grand jury, knowingly and willfully given, as to the issue of defendant's presence there, and the other by previous contradictory statements and the physical impossibility and the unreasonableness of his testimony; and movant further insists, that even though both of these witnesses for the

State testified truthfully, neither of them saw the killing, but both admit that neither knew who killed Mr. McNair, and therefore the State must still rely upon circumstantial evidence and does rely upon circumstantial evidence;" (c) "for the reason that the same was misleading and not sufficiently comprehensive, because the court failed to instruct the jury what is circumstantial and what is positive evidence, but on the contrary intimates that there is no circumstantial evidence in the case as to the material issue— as to who fired the shot that killed the deceased."

9.   The charge quoted in the ninth headnote was applicable to the boy Oscar Whitehead, a principal witness for the State, who testified at the trial that he saw the defendant Tom King at the scene of the homicide, and that he saw King point the gun at McNair and shoot the only shot that was fired.   Prior to the trial the boy had made contradictory statements out of court, to the effect that the defendant Tom King was not there and that a different person committed the homicide.   He had also testified before the grand jury contradictory to his testimony delivered at the trial.   It is provided in the Civil Code (1910), § 5881, and the Penal Code (1910), § 1052, that "A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case.   .   .   When thus impeached, he may be sustained by proof of general good character, the effect of the evidence to be determined by the jury."   The foregoing is only one of the several rules relating to the subject of impeachment of witnesses.   This rule provides for impeachment of a witness and for sustaining him when his credibility has been attacked in the manner designated, but leaves it to the jury to determine whether the witness has testified truthfully.   If the witness has been sustained by proof of general good character, that would go to his credit, but in the absence of such proof the truthfulness of his testimony would still be for determination by the jury.   The mere fact that the witness had made statements out of court, contradictory to his testimony at the trial, would not as matter of law necessarily deprive his testimony of all probative value.   *Ector* v. *State,* 120 *Ga.* 543 (2) (48 S. E. 315) ; *Waycaster* v. *State,* 136 *Ga.* 95 (3) (70 S. E. 883) ; *Henrich* v. *McCauley,* 151 *Ga.* 138 (106 S. E. 94) ; s. c. 154 *Ga.* 855 (115 S. E. 655). The charge was substantially in accord with the statute.

10.   Complaint is made of a failure to charge:   (a) "If a witness willfully and knowingly swear falsely as to a material matter, his testimony ought to be disregarded entirely unless corroborated by circumstances or other unimpeached evidence," and (b) "that, as a matter of law, a witness is successfully impeached when it is proven to the satisfaction of the jury that he has willfully and knowingly sworn falsely to a fact material to the issue in the case, unless said witness was corroborated by circumstances or other unimpeached evidence."   There was no timely written request, and in the absence of such request it was not erroneous to omit to charge on the law of impeachment of witnesses.   *Watts* v. *State,* 120 *Ga.* 496 (48 S. E. 142) ; *Helms* v. *State,* 136 *Ga.* 799 (3, 4) (72 S. E. 246) ; *Giles* v. *Voiles,* 144 *Ga.* 853 (2) (88 S. E. 207) ; *Elbert County* v. *Threlkeld,* 145 *Ga.* 133 (3) (88 S. E. 683).

11.   The court charged:   "Admissions, gentlemen of the jury, usually apply to civil cases.   Confessions apply to criminal cases. I charge you, on the subject of admissions, that all admissions should be scanned with care, and that all confessions should be received with great caution.   A confession alone, gentlemen of the jury, will not be sufficient to convict, unless corroborated by the other facts in the case.   I also charge you this principle of law, that acquiescence or silence, when the circumstances require an answer or denial, or other conduct, may amount to an admission." The sheriff testified:   "I knocked on the door, and Tom said 'Who is that?' and I said, 'Me,' and he opened the door, and I said, 'All right, Tom, come ahead and go with me.'   That is all I said. He made no reply.   The first statement Tom made was in Macon the next morning.   At the time I told him to put on his clothes and come with me, he said 'I can prove by Mr. Walter Craig and Mr. Dock Torbet I have been here all night.'   When he said that, I had not said anything to him at that time except to go with me. I had not told him what I was arresting him for.  .  .   On the trip to Forsyth Tom King did not make any other statements to us.   I did not disclose to him on that trip what he was under arrest for, not until I got to Forsyth.   Mrs. Bittick was by herself, and I told her he was charged with killing county policeman Mr. McNair, and Tom did not say anything at that time.   He had said not a word on the trip from Indian Springs to Forsyth, and he had not asked any questions as to what he was being arrested

for." The officer who accompanied the sheriff at the time he arrested the defendant and carried him to jail testified that the sheriff "knocked on the door, and Tom says, 'Who is that?' It is 'me,' and we opened the door, and he covered him with the pistol and told him to get his clothes on, he was after him. After that Tom says, 'I can prove by Mr. Walter Craig and Mr. Dock Torbet and Lucine [his wife] that I haven't been out of this house to-night.' At that time nothing had been said except what I have stated; he had not been told what he was accused of, or when the alleged crime had been committed, or anything except just what I have stated. . . I went to Forsyth with the sheriff and Tom. On that trip Tom never asked us anything at all about what he was being arrested for, and we didn't tell him anything until we got to Forsyth, and the sheriff wasn't there, and we lodged a charge against him with Mrs. Bittick, and that was the first time we told him what he had been arrested for, and he didn't ask us. He never opened his mouth when the sheriff told Mrs. Bittick in his presence that he was being arrested for the killing of Mr. McNair." The foregoing is all of the evidence as to statements expressly or impliedly made by the defendant. These statements are insufficient to constitute a confession, and it was erroneous for the judge to charge on the law of confessions. *Dumas* v. *State,* 63 *Ga.* 601 (5); *Covington* v. *State,* 79 *Ga.* 687 (2) (7 S. E. 153); *Lee* v. *State,* 102 *Ga.* 221 (2) (29 S. E. 264); *Owens* v. *State,* 120 *Ga.* 296 (3) (48 S. E. 21); *Weaver* v. *State,* 135 *Ga.* 317 (69 S. E. 488); *West* v. *State,* 155 *Ga.* 482 (11) (117 S. E. 380).

12. The ruling announced in the twelfth headnote does not require elaboration.

13. The charge quoted in the thirteenth headnote restricted the inquiry to the single matter of whether the defendant committed the homicide. Oscar Whitehead was under impeachment as a witness, and his account of the tragedy could not as a matter of law be accepted as conclusive by the court. The other evidence tending to show that the defendant fired the fatal shot was circumstantial. It did not purport to state expressly all that occurred at the immediate time of the homicide. It did not show that the officers had a warrant for the arrest of the defendant, nor did it demand a finding that the defendant was committing a crime in the presence of the officers. If the decedent was attack-

ing the defendant unlawfully with a pistol or attempting to arrest him unlawfully, these would be matters of justification or mitigation. The defendant's plea of not guilty put these matters in issue, either of which if found in favor of the defendant would prevent his conviction of the crime of murder. If it be conceded that a still was being illegally operated for the manufacture of intoxicating liquors, and that the defendant was present and fired the fatal shot, his presence might have been merely casual without participation in the illegal enterprise, and he may, without knowing that decedent was an officer, have shot in good faith to prevent an attack upon him with the pistol that apparently fell from the hand of the decedent when the latter fell; or the defendant likewise in good faith may have shot to prevent an illegal arrest by the decedent. The charge should not have been so restricted.

*Judgment reversed. All the Justices concur.*

RUSSELL, C. J., concurring specially. I concur in the judgment and in all of the rulings in the several divisions of the opinion and headnotes, except that in my opinion the practical exclusion from the consideration of the jury of the effect of the evidence of alibi to engender a reasonable doubt, even if it were not sustained as required by law to the reasonable satisfaction of the jury, would also have required the grant of a new trial. Also the exception contained in the seventh ground, with reference to the method of presenting the law of the defendant's statement to the jury, is, in my opinion, sustained upon every assignment of error presented thereto; and the court should have charged as set out in the eighth division of the opinion, with relation to the proper consideration of the circumstantial evidence in this case.

BECK, P. J. I concur in the judgment of reversal, but I am of the opinion that the charge set out in the fourth headnote is in substantial accord with the statute and was not open to the criticism made.

GILBERT, J. I concur in the judgment of reversal, but also am of the opinion that the charge ruled upon in the fourth headnote is in substantial accord with the statute; and I agree that the charge set out in the thirteenth headnote was error on the ground that it was an expression of opinion by the court, which is prohibited under the Civil Code (1910), § 4863, as contended for by movant.

HINES, J.   I concur in the judgment of reversal on the grounds:
(a) That the court erred in his charge upon the subject of con-
fessions.   (b) That he erred in the charge set out in the thirteenth
headnote, on the ground that it was an expression of opinion by
the court as to the guilt of the accused.