23429. WILLIAMS v. THE STATE.

ARGUED APRIL 11, 1966—DECIDED MAY 5, 1966—
REHEARING DENIED MAY 27, 1966.

*James W. Dorsey, Lynn A. Downey, M. M. Armistead, Nall, Miller, Cadenhead & Dennis,* for appellant.

*Reid Merritt, Solicitor General, Luther C. Hames, Jr., Arthur K. Bolton, Attorney General, Rubye G. Jackson, Assistant Attorney General,* for appellee.

ALMAND, Justice. Under an indictment returned at the April term, 1965, of the Gwinnett Superior Court charging Venson

Eugene Williams and Alex S. Evans with murder in that they on April 17, 1964, did kill one Jerry S. Everett by shooting him with a pistol, in the separate trial of Williams he was found guilty on October 7, 1965, and sentenced to death on October 8, 1965. His motion for a new trial on the general grounds and 33 special grounds was overruled on January 28, 1966. Notice of appeal was timely filed, and the appeal is before us in which the appellant asserts that he is entitled to a new trial if error be found in any one of his 33 enumerated grounds of error. Our sole duty being to review the trial in the court below to ascertain if an error of law was committed, we have reviewed each enumeration of error and render our opinion and judgment on each one seriatim.

■ Motion to change venue. It is asserted that the court erred in not sustaining defendant's motion for a change of venue because "of the excitement and the inflamed state of public opinion that has existed since the homicide, which was calculated to poison the minds of the jurors of said county, a large portion of the jurors have formed an opinion as to petitioner's guilt, or have become prejudiced or biased against him either from having read or heard accounts of the murder and indictment of this defendant in the newspapers and various publications or over the television or radio, or from having heard statements of others and of relatives and friends of the decedent which are exceedingly damaging to petitioner and prejudicial to a correct termination of the issues involved in the case. The public mind has been so poisoned and prejudiced by exaggerated rumors and by accounts in the newspapers, local press and other news media that petitioner will be unable to get a fair trial by an impartial jury in said county, the sort of trial that he is entitled to under the laws of the land, the State of Georgia, and the Constitution of the United States of America, particularly Section One, Fourteenth Amendment."

On the hearing of this motion, the defendant's evidence consisted entirely of newspaper articles of general circulation in the county which carried reports of the slaying of three Gwinnett County police officers and particularly the accounts in the newspapers that "Gwinnett Murders Solved," in which the defendant

was named as one of the participants. It was contended by the defendant that these newspaper reports contained the names of those indicted and the past criminal record of the defendant was given. It was contended that this wide publicity as to the indictment of the defendant and his prior criminal record made it impossible to obtain a fair trial in Gwinnett County. In support of his motion, defendant offered no opinionative evidence.

As a countershowing, the State introduced in evidence the affidavits of 30 citizens of Gwinnett County in which they swore that in their opinion the defendant could receive a fair trial in Gwinnett County.

The trial judge did not err in denying the motion for a change of venue. This ruling follows our ruling in *Morgan v. State*, 211 Ga. 172 (84 SE2d 365), where it was held that the court did not err in overruling a motion for a change of venue based solely upon grounds that newspaper reports published in the county in which the charges against the defendant were pending were inflammatory and rendered it impossible to obtain a fair trial. This court in a unanimous opinion said: "The mere fact that newspapers had carried items and editorials that the defendant had confessed the crime for which he stood indicted, or had published articles in regard to the defendant which were inflammatory in nature, would not of itself be sufficient to establish the fact that a fair and impartial trial could not be had in Richmond County, without further alleging that the jurors who had been summoned to try the case had read the articles and formed a fixed opinion as to the guilt or innocence of the defendant from reading such articles. As to whether any juror empaneled for the defendant's trial had read the articles or formed any opinion therefrom, the right of the defendant in the selection of a fair and impartial jury was protected by the right of challenge to the poll, to have the voir dire questions propounded, and to have peremptory challenges. From the fact that the two local newspapers gave a large amount of publicity to the case, it does not follow that such prejudice existed in the whole county as to make a fair and impartial trial impossible." Id. at p. 175. See also *Blevins v. State*, 108 Ga. App. 738 (134 SE2d 496).

■ Prior to the trial, the defendant filed a motion praying

that the court order and direct the State to produce certain alleged (a) names and addresses of all those persons whose testimony "was in substance related to the grand jury"; (b) "a full, exact and complete copy of any statement or affidavit" in the control of the solicitor general of those persons who would be called as witnesses; (c) the names and addresses of the officers who questioned the wife of the defendant in April, 1964; (d) the minutes of the grand jury which indicted the defendant; (e) all witnesses for the prosecution to be made available to the defendant for the purpose of taking the depositions of those persons and (f) the written agreement, if any, made to Wade L. Truett for immunity.

In denying these motions for discovery or production of evidence, error is alleged in grounds 2, 3, 4, 5, 6, 7, and 8. This court in *Blevins v. State*, 220 Ga. 720 (2) (141 SE2d 426), held: "There is no statute or rule of procedure of force in this State which requires a solicitor general or other prosecuting officer to make his evidence, documentary or otherwise, available to the accused or his counsel before trial. . . ." Id. at p. 723. See also *Walker v. State*, 215 Ga. 128 (109 SE2d 748). It has never been the practice in this State for a court to engage in the investigation as to whether the evidence before a grand jury was sufficient to warrant an indictment. *Buchanan v. State*, 215 Ga. 791 (113 SE2d 609). Under these prior rulings, which we follow and approve, these grounds are without merit.

■ We come now to alleged error number 9 which charges that the court erred in excusing 37 persons called for jury service on the grounds that in response to the question given to them on the voir dire as to whether they were conscientiously opposed to capital punishment, each of them was excused by his answer in the affirmative. Defendant alleges error on the ground that the removal of this class of jurors denied him due process of law as contemplated by Federal and State Constitutions.

*Code* § 59-806 provides that in trials for felonies any juror may be put upon his voir dire and if in response to the question "Are you conscientiously opposed to capital punishment?" his answer shall be in the negative he shall be held to be a competent juror. We have held that if he answers in the affirmative

he is incompetent to serve. *Mickens v. State*, 149 Ga. 185 (99 SE 779); *Cherry v. State*, 220 Ga. 695 (6) (141 SE2d 412).

■ Enumerations of error numbers 9-26 inclusive assert that the court erred in placing upon the defendant in the selection of a jury 13 jurors who were not impartial and qualified. In the interrogation of each of these prospective jurors by counsel for the defendant, they were asked if they had any belief or conviction from what they had read or heard in the news media that the defendant had a past criminal record. Most of the jurors answered that they had either heard or read the reports. Some answered that they believed the past criminal record of the defendant to be true. Not a single one in response to a question said he would vote to convict the defendant on his past criminal record. On the whole, the answers of these prospective jurors were that they would believe he had a past criminal record until proved to the contrary. Not a single one of the interrogated jurors stated that the fact that the defendant had a prior criminal record would affect or control his or her verdict as to whether the defendant was guilty of the charge of murder.

It may be noted for the record that at the time the defendant was indicted, he was a convicted felon serving a sentence in the Federal Penitentiary and was in court on the trial of this case in the custody of Federal Marshals. The opinions of the several prospective jurors that they believed from the news media that the defendant had a prior criminal record was supported by this confrontation in open court.

In passing, we do not overlook the contention of counsel for the defendant that he could not get a fair trial because reports of the news media—newspapers, radio and television—in the investigation of the crime by reports and pictures with detailed accounts and descriptions as to individuals alleged to be involved, their past history and quoted opinions of officers and prosecuting officials, may be read or heard by prospective jurors in the county where the crime was committed. Yet such does not disqualify a juror from serving if on the voir dire he answers in the negative the questions propounded to him under *Code* § 59-806.

Today with fact and rumor being communicated by one to another by newspaper, radio and television and all prospective

petit jurors being selected by reason of their intelligence and uprightness (*Code* § 59-106), the jury box consists of those who are literate and can read, hear and understand. Under present conditions of our society, to obtain a jury of twelve persons who have not read, seen or heard of an investigation and report of an unusual criminal offense, we would have to rely on a jury of either illiterates or those who are either blind or deaf.

■ Ground 26 asserts that after failing to disqualify the several jurors, the court should have granted his motion for a change of venue. In light of our ruling in Division 4, the denial of this motion was not error.

■ Ground 27 alleges that the court erred in denying the defendant's motion for the discovery of a statement made and signed by M. C. Perry, a witness for the State, and requiring the defendant to continue cross examination without the benefit of such discovery and production. Under our ruling in Division 2 of this opinion, this was not error.

■ It is urged in ground 28 that the court erred in not granting defendant's motion for a mistrial when a witness for the State in response to a question propounded by counsel for the State placed the character of the defendant in issue.

On redirect examination the following occurred: "Q—M. C., you testified you had a legal fee of $1,000 I believe, is that right? A—Yes. Q—But you only asked Venson for $500? A—Yes. Q—What was that for, why did you only ask him for $500? A—Well, I stole the car that I had, that I was convicted on, I stole it for him and another fellow and got caught with him and the other fellow was in the chain-gang." Counsel made a motion for a mistrial based upon this answer.

When counsel for the defendant cross examined the witness, the following occurred: "Q—Now, I believe you have just been released from prison? A—No. Q—How long have you been out? A—I was in the DeKalb County jail. Q—DeKalb County jail? A—Yes. Q—And you called him as soon as you got out? A—No. Q—How long had you been out? A—I got out on Thursday or Friday, and Mr. Armistead, I promised Mr. Armistead a car that I had at his motel, and he come to pick it up. Q—He represented you in some criminal prosecution?

A—Larceny of an automobile. Q—You owed him a fee? A—
$1,000. Q—You hadn't paid him that $1,000? A—No. Q—
That was the purpose of your visit with him [defendant Williams]? A—To Mr. Armistead's, yes. Q—Now, after this conversation that which you have related with Venson, when did you get in trouble and get arrested, how much longer after that? A—I had already been arrested, me and Venson and us was under appeal bond, and the day that the murder happened, like the murder happened that night, the Court of Appeals turned my decision down and I got a letter that day from the court in Atlanta telling me to report and start on my time on the 24th of April."

This witness on direct examination had testified as follows: "Q—. . . You called Venson from there you say? A—Yeah. Q—Did you get him when you called him? A—Yes, one Sunday morning. Q—What did you talk about? A—I called Venson to have him to turn over $500 to Mr. Armistead for Wesley Asinof, another lawyer. Q—Was that for attorney's fees? A—Yeah. Q—Did you talk about anything else during the course of that conversation? A—Yeah. Q—Tell us if you would in your own words what did you discuss? A—Venson asked me what I was doing, and I told him nothing, I had just got out of jail on larceny of automobile. Q—You were out of jail at that time? A—Yeah. Q—All right, sir. A—And he asked me was I interested in getting some more cars. Q—What do you mean by getting some more cars? A—Me and him had been in the car business. Q—In other words, you are talking about he wanted you to steal one? A—Yes."

Counsel for the defendant not having objected when it was first brought before the jury as to defendant's past criminal record and subsequently cross examined the witness as to such past record, he was not in a position to ask for a mistrial when counsel for the State pursued the same subject. See *Whitley v. State*, 188 Ga. 177 (3) (3 SE2d 588); *Cady v. State*, 198 Ga. 99 (5) (31 SE2d 38).

■ Ground 29 complains of the court's refusal to grant the defendant's motion requiring the State to produce a tape recording of a statement by Wade Truett, a State witness, given to

the Georgia Bureau of Investigation. The refusal of his motion was proper under our ruling in Division 2 of this opinion.

■ As will be disclosed on our rulings on the general grounds of the motion for a new trial, it was not error for the court, on motion of the defendant, to refuse to direct a verdict of acquittal as complained of in ground 30.

■ The 31st ground claims that the court erred in permitting, over objection of the defendant, the State to cross examine Lynn A. Downey, his witness, on matters not inquired into by counsel for the defendant on direct examination.

This enumeration of error was not argued orally or by brief by the defendant and is considered as abandoned.

■ The court charged the jury as follows: "I charge you also that the testimony of one accomplice if satisfactory to the jury is sufficient corroboration of another accomplice in a felony case." Ground 32 asserts this charge to be erroneous for the reason there was not any testimony by one accomplice corroborating the testimony of another accomplice. The charge given was a correct statement of the law (*McCormick v. State*, 176 Ga. 21 (166 SE 762)) and authorized by the evidence. *Lyles v. State*, 130 Ga. 294 (8) (60 SE 578).

■ Ground 33 asserts that the court erred in refusing to give in charge the following request: "I charge you that in view of the promise of immunity given by the State, you may give no weight whatsoever to the testimony of Wade L. Truitt [sic], should you find the promise of immunity has caused the witness Wade L. Truitt [sic] to swear falsely against this defendant, Venson Eugene Williams, in hopes that he, Truitt [sic], would avoid criminal prosecution." It was not error to refuse to give this instruction because it was not a correct statement of the law, and if the court had given the requested charge, it would have been an invasion of the province of the jury which has the exclusive right to pass on the credibility of witnesses. *Code* § 38-1805; *Stone v. State*, 118 Ga. 705 (6) (45 SE 630); *Lee v. State*, 66 Ga. App. 613, 619 (18 SE2d 778).

■ Ground 34 charges that the court erred in failing to charge the jury "that conviction of a crime involving moral turpitude goes to the credibility of a witness and is a method of impeach-

ing a witness," there being evidence that three witnesses for the State had each been convicted of a crime or crimes involving moral turpitude.

There being no request to charge on the circumstances in which a witness may be impeached, this ground is without substance. *Downing v. State,* 114 Ga. 30 (3) (39 SE 927); *Douberly v. State,* 184 Ga. 573 (5) (192 SE 223).

We turn now to the general grounds. The sufficiency of the evidence to sustain the verdict of guilty depends entirely on whether the testimony of Wade L. Truett, an admitted accomplice, was sufficiently corroborated. In other words, our task is to determine whether there was corroborating evidence independent of the testimony of the accomplice which directly connected the accused with the crime. *Lanier v. State,* 187 Ga. 534 (1 SE2d 405).

Wade L. Truett, a co-indictee, was sworn as a witness for the State. In brief he testified that he and the defendant operated as partners a garage in Hartsville, South Carolina, and that they bought from the White Body Shop in Atlanta a 1963 model two-door hardtop maroon-colored Oldsmobile which had been damaged in a wreck. They removed the car to their shop in Hartsville. Their plan was to steal an identical 1963 model Oldsmobile, repair the purchased car with parts from the stolen car, and sell the other parts for a profit. The defendant telephoned Alex Evans, who lived in Gwinnett County, and told him they needed a 1963 two-door hardtop maroon-colored Oldsmobile in order to sell the Oldsmobile they bought.

Truett and the defendant came to Lawrenceville, Georgia, on the afternoon of April 16th, 1964, in a 1962 white Chevrolet, went to the house of Thomas Stephens, and met there one William Bohanon. They picked up Alex Evans about ten that night. They found, at Evans' direction, the type of Oldsmobile they were looking for parked near an apartment on Briarcliff Road. Defendants Williams and Evans drove away with the stolen 1963 model Oldsmobile, and Truett followed in the white Chevrolet. They arrived on Arc Road in Gwinnett County with both cars about one or two a. m. on the morning of April 17th. The cars were driven off the road, and while the defendant Williams

was replacing the ignition switch on the dash board of the stolen car and Truett was removing the license plate, a car approached from the vicinity of Pleasant Hill. It was a police car containing three policemen. (Identified by other evidence as being police officers Davis, Gravitt and Everett of the Gwinnett County Sheriff's office who had been dispatched to the area by radio.) Evans, with two pistols in his hands, ordered the officers to put up their hands. Williams disarmed the three officers, and Truett manacled them with their handcuffs. Williams disconnected the radio wire in the police car; Truett then drove the police car back into the woods. Truett then drove the Chevrolet in the direction that Williams, Evans and the three officers had gone. Truett heard something that sounded like fire crackers. He found the three officers lying on the ground. The defendant took some bullets from the belt of one of the officers, put them in a pistol, and shot one of the officers. The defendant and Evans set fire to the Oldsmobile. All three left the scene in the Chevrolet and drove south on Arc Road, and as they drove along Beaver Ruin Road, Evans threw the pistols and flashlights they took from the three officers out of the car. They returned Evans to his car, and the witness and defendant drove back to Hartsville, arriving there after daybreak.

On April 24th, they bought some parts for the 1963 Oldsmobile from one E. F. Willing in Aiken, South Carolina. Six months later, they went back to Willing and had him change the date on the receipt from April 24th to April 2nd, 1964. Williams told Willing that the police were trying to involve him in the killing of the three officers, and the "primary reason was it would indicate we didn't need the car that was stolen the night the police officers were killed, we already had the parts to fix the car with."

We now turn to the evidence and circumstances that tend to corroborate the testimony of Truett, the accomplice. (a) On the morning of April 17th, the bodies of the three officers were found in the woods off Arc Road, each one shot one or more times by bullets and handcuffed together. (b) The wires on the radio of the police car were detached. (c) A 1963 two-door hardtop Oldsmobile (identified by the owner) was found burning. (d) M. J. Vandiver of the Georgia Bureau of Investigation on

April 17th found three pistols and two flashlights in a ditch along the side of Beaver Ruin Road. These pistols were identified as belonging to the three dead officers. (e) Thomas Stephens and William Bohanon testified that Truett and the defendant came by the home of Stephens on the afternoon of April 16th, 1964, in a white Chevrolet. (f) Witnesses Thomas and Meier testified that a damaged 1963 two-door hardtop Oldsmobile was bought by Williams on April 2nd, 1964. (g) One Perry testified that a few days prior to April 16th, both Williams and Evans said they had to have a 1963 Oldsmobile and wanted Perry to help them to get one, but he refused to help. (h) E. F. Willing of Aiken, South Carolina, corroborated Truett's evidence as to the purchase of the Oldsmobile parts by Williams and Truett and their getting him to change the date of the purchase from April 24th to April 2nd and their reason for the change. (i) Lynn W. Shaw testified that he is a prisoner in the United States Penitentiary at Atlanta. He stated that he knew the defendant and had had a conversation with him in the hospital at the prison after the defendant had been indicted for the killing of the three officers. Shaw asked the defendant how he came out at the hearing, and the defendant replied: "If that dirty s.o.b. Alex Evans hadn't shot Everett we wouldn't be in this mess." (j) In his statement to the jury, the defendant said that he and Truett were partners in 1964 in a garage business in Hartsville, South Carolina.

This court in *Callaway v. State*, 151 Ga. 342, 348 (106 SE 557), said the following: "The facts relied upon as corroboration may be trifling when viewed by themselves and separately from the entire case; but the jury had the right to consider all the facts and to consider them in their relations one to another, and to determine whether or not, considering the facts and comparing them in their proper setting, under the evidence adduced, they tended to connect the defendant with the commission of the crime and were a sufficient corroboration of the evidence of the accomplice to authorize a conviction of the accused under the law as given them by the court." Again in *Waldrop v. State*, 221 Ga. 319, 320 (144 SE2d 372)', this court said: " 'Slight evidence from an extraneous source identifying the accused as a

participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict. . . The sufficiency of the corroboration of the testimony of the accomplice to produce conviction of the defendant's guilt is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence of corroboration connecting the defendant with the crime, it can not be said, as a matter of law, that the verdict is contrary to the evidence.' *Hargrove v. State*, 125 Ga. 270, 274 (54 SE 164); *Rawlings v. State*, 124 Ga. 31, 49 (52 SE 1); *Mitchell v. State*, 202 Ga. 247 (3) (42 SE2d 767)." "The conduct of a defendant before, during the time of, and after the commission of a crime, may be considered by the jury in establishing his intention and his participation, to determine whether or not such intention and conduct were sufficient corroboration of the testimony of an accomplice to sustain a conviction. This may be done by circumstantial as well as by direct evidence." *Mercer v. State*, 68 Ga. App. 740 (24 SE2d 69).

The theory of the State's case was that the defendant, Truett and Evans entered into a conspiracy to steal an automobile, a felony, and in the process of carrying out this unlawful act, one or more of them, upon their being caught by the three police officers, shot and killed the officers. The court fully charged the jury the law relating to conspiracy.

We are of the opinion that the facts relied upon by the State as corroborating the testimony of the accomplice Truett tended to connect the defendant with the crime of murder and were sufficient to support his conviction.

It was not error to overrule the motion for a new trial.

*Judgment affirmed. All the Justices concur, except Quillian, J., who dissents.*

QUILLIAN, Justice, dissenting. I am constrained to dissent from the holding made in Divisions 11 and 4 of the majority opinion and the judgment of affirmance. Division 11 contains the complaint that the instruction to the jury, "I charge you also that the testimony of one accomplice if satisfactory to the jury is sufficient corroboration of another accomplice in a felony case," was erroneous for the reason there was not any testimony by one accomplice corroborating the testimony of another accomplice.

I have very meticulously reviewed the evidence submitted upon the trial of the case and find that the charge excepted to was not authorized by the evidence. The only accomplices who testified at the trial were Wade Truett and Alex S. Evans. Truett testified in minute detail to every facet of the gruesome murder and there was, while very meager, barely enough evidence of other facts and circumstances to corroborate his testimony in the main. However, Evans did not, in any legal sense, corroborate Truett's testimony. The only circumstance that appears to even approach similarity in the evidence given by Truett and Evans is this: Truett testified that when the officers, shortly to be victims of murder, arrived at the scene of the homicide Evans "talked to the police officers like he knew them, I mean, he would call them by name." Evans denied that he had been at the scene of the tragedy, but did testify that he, having previously been a deputy sheriff, knew the officers "real well." So, in this circumstance, the court is of the opinion, may be found corroboration of the accomplice Truett's testimony on the part of the alleged accomplice Evans.

Here several principles of evidence are applicable. One is: "An instruction unauthorized by the evidence is improper, and, if it is not apparent that the jury could not have been misled thereby, is cause for new trial." *Citizens & Southern Nat. Bank v. Kontz*, 185 Ga. 131 (6) (194 SE 536); *Reeves v. State*, 196 Ga. 604, 614 (27 SE2d 375), where it was held that "instructions, even though abstractly correct, should not be given unless authorized by the evidence, or in criminal cases by the evidence or by the statement of the defendant."

In *Price v. State*, 208 Ga. 695, 696 (3a) (69 SE2d 253), this court held: "The rule is well established that, to sustain a conviction in a felony case upon the testimony of an accomplice, there must be corroborating facts or circumstances, which, in themselves and independently of the testimony of the accomplice, directly connect the defendant with the crime, or lead to the inference that he is guilty, and more than sufficient to merely cast on the defendant a grave suspicion of guilt." "In every case the corroborating circumstances must connect the defendant with the crime independently of the testimony of the accomplice, and this

requirement is not met by merely corrobrating the accomplice as to time, place and circumstances of the transaction, if there be nothing to connect the defendant therewith." *Lanier v. State,* 187 Ga. 534, 539 (1 SE2d 405), and cases therein cited.

If an accomplice's testimony does not corroborate the testimony of another accomplice as to more than mere time, place and circumstances of the transaction, but as here falls short of corroborating any fact that connects the defendant with the commission of the crime, in the contemplation of the law, it is no corroboration of the testimony of another accomplice. The testimony of Evans that he knew the officers is not corroborative of any testimony of Truett that he was at the scene of the homicide or that connected either Evans or the defendant with the murder. It was an independent circumstance that had no corroborating value in connecting the defendant with the offense.

In this connection, the holding of *Allen v. State,* 215 Ga. 455, 458 (111 SE2d 70), is factually similar. In the *Allen* case the facts, stated as appearing from the record, to corroborate the testimony of the accomplice Rothschild as to the defendant Allen's connection with the crime were: "The testimony of Speer McElroy, a Winder policeman, that he saw the defendant Allen in front of Tomlin's Drive-In, in Winder, Georgia (which is several miles distant from the scene of the killing near Jefferson), on the night in question, when he was called there to push off 'a faded out, old model automobile'; that he knew the defendant Allen, but did not know the man Allen pushed off; that the defendant pushed the car off, it cranked, caught up, and went on down the highway toward Atlanta; that he called the police station by radio and had the boy on the desk to call Allen to come and push the car off, and his testimony as to this call by the policeman was substantiated by the police department radio operator; the testimony of George Crane, the principal stockholder, and Joseph Howard Sims, an employee, of Sportsman's Inc., of Athens, Georgia, that they handled and cleaned guns, and they knew Allen; that sometime during the year 1957 Allen brought them a very rusty 38 Smith & Wesson nickel or chrome plated pistol to be cleaned; the testimony of Deputy Sheriff J. R. Austin that, on the night of June 19, 1956, he had

a road block set up at the intersection of Georgia Highways 53 and 11, one the Jefferson road and the other the Gainesville road, and that the defendant Allen came through that road block driving a Ford car, and that he saw a faded blue-colored Plymouth, driven by a white man whom he did not know, come from Winder towards Jefferson; that he did not motion this car through the road block, but that some other policeman might have done so; and testimony of Patterson, owner of the Plymouth car, who testified that he had communicated with Allen three or four times since the homicide at the instance of Rothschild; that he had relayed messages to him from Rothschild in the name of 'Red,' the name Rothschild told him Allen knew him by; that the first message was that it was too hot in this part of the country for Rothschild, and that he could not come back right away; and on another occasion that Rothschild wanted to know if everything was all right with him, and that Allen said, 'Yes, it was.' " In addition, the record in the *Allen* case shows the officers found the "coveralls" at the place where Rothschild testified he left them when he and Allen were fleeing from the scene of the homicide. There this court held the corroboration of the accomplice Rothschild was not sufficient to connect Allen with the murder.

It will be noted that the undisputed proof of the State corroborated the accomplice Rothschild in saying that he knew Allen and "Allen pushed his car off," on the afternoon of the homicide. The testimony of Speer McElroy clearly corroborated the accomplice Rothschild's testimony that he knew the defendant Allen. Yet, this court held the corroborating of Rothschild's testimony that he knew and associated with Allen was not a fact connecting Allen with the murder of Charles Drake, even though there were other circumstances related by another witness, Patterson.

Now, in the present case the charge was not simply that one accomplice could corroborate the testimony of another, but "that the testimony of one accomplice if satisfactory to the jury is *sufficient corroboration* of another accomplice in a felony case." Thus, it is apparent to me that where there was in the record no testimony of Evans that the jury could accept as legally sufficient to corroborate the testimony of the accomplice Truett, the charge was not warranted by the evidence.

Division 11 did not deal with the question of whether there was evidence in the record corroborating the testimony of Truett, but simply whether the alleged accomplice Evans gave testimony that could be held sufficient for the purpose. The error was hurtful because the charge could confuse the jury. This is apparent because there were several other witnesses that the jury could have found were accomplices of the witness Evans, Truett and the defendant in other unlawful transactions, and their testimony may have been sufficient to corroborate the testimony of Truett, but they were not accomplices in the murder case, the case then on trial. The rule is that to be an accomplice of the defendant the witness must be an accomplice in the commission of the crime for which the defendant is on trial, not some other criminal transaction or transactions.

I can not agree with the pronouncement of the majority in Division 4 of the opinion. In view of the testimony of the juror J. H. Clack given in response to questions respecting his qualification as juror, it is my opinion that he was disqualified. He testified that he believed the newspaper report that the return of the indictment had solved the crime, for the commission of which the defendant was on trial, and that the defendant would have to produce evidence of his innocence in order for that to be overcome. The burden of proof was upon the State. *Code* §§ 38-103 and 38-110. The defendant was, under the law, presumed not to be guilty but innocent, *Code* § 38-118, and that presumption being in the nature of evidence is a valuable and vital right. In *Sikes v. State,* 120 Ga. 494, 495 (48 SE 153), it is held: "It is sufficient if [the defendant] create a reasonable doubt. He is not obliged to prove his innocence, but may rely on the failure of the State to establish his guilt." *King v. State,* 163 Ga. 313 (136 SE 154). This court held in *Fitzgerald v. State,* 184 Ga. 19, 21 (190 SE 602): "Every person charged with crime is presumed to be innocent until he is proved guilty by competent evidence. *Thigpen v. State,* 11 Ga. App. 846, 850 (76 SE 596). The Constitution of this State insures to one charged with a crime against the laws thereof that he shall have a trial by an impartial jury. *Code* § 2-105. Therefore it is essential that the jury be not improperly influenced or prejudiced

against the person on trial. It is a general rule that if the jury act from passion or prejudice against the accused in rendering their verdict against him, a new trial will be granted."

I am aware the juror further swore that his mind was subject and receptive to the evidence in the case; that he was not predisposed against the defendant or had not fixed in his mind that the defendant was guilty; that he could listen to the evidence fairly and properly construe the law as given in charge and could "do what is right" between the State and the defendant; that he had no reservations in his mind that he would not be a fair and impartial juror. This does not alter my opinion. In the first place, the burden was still placed, by the juror, upon the defendant to prove his innocence. Further, it is extremely difficult for a juror to decide whether a former opinion has been eradicated by evidence. It is an extremely delicate sense of psychological balance that enables one to determine whether he is influenced by pre-trial impressions amounting to an opinion so strong that it must be overcome by evidence, or whether the evidence adduced upon the trial provided the conclusion in his mind of the defendant's guilt. Such a juror, in my opinion, is not impartial.

In the case of United States v. Wood, 299 U. S. 123, 145 (57 SC 177, 81 LE 78), there is sound legal reasoning by Chief Justice Hughes: "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." In Irvin v. Dowd, 366 U. S. 717, 727 (81 SC 1639, 6 LE2d 751), where some of the jurors had admitted preconceived opinions of the defendant's guilt, but on voir dire claimed they could be impartial, the observation is made: "With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations." In United States v. Denno, 313 F2d 364, 372, is the pronouncement: "It is true that there was drawn from jurors, even those who stated that it would take evidence to alter their opinions of guilt, the statement that they felt they could act impartially. This, however, placed on those individuals a burden we think impossible to be borne, in the light of the nature

of the publicity, the high proportion of jurors holding opinions of guilt, the length of time the opinions had been held and their persistence. 'The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man.' Irvin v. Dowd, supra, at 727. . . Compare Beck v. Washington, 1962, 369 U. S. 541. . . . In the Beck case, all those who admitted bias or pre-formed opinion as to guilt or that they might be biased or might have formed an opinion were excused . . Here there were so few that had not formed an opinion that the inquiry was mainly whether the juror could 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Irvin v. Dowd, supra, at 723. . . The difficulty in this situation has been described by the First Circuit in Delaney v. United States, 1st Cir., 1952, 199 F2d 107, 112-113, 'One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.' "

For the foregoing reasons, I dissent.