24569.   LINGO v. THE STATE.

ARGUED APRIL 8, 1968—DECIDED MAY 9, 1968—
REHEARING DENIED MAY 23, 1968.

*H. B. Edwards,* for appellant.

*Marcus B. Calhoun, Solicitor General, Arthur K. Bolton, Attorney General, Marion O. Gordon, Assistant Attorney General, Joel C. Williams, Jr., Deputy Assistant Attorney General,* for appellee.

UNDERCOFLER, Justice.   The defendant was convicted of the murder of John Clarence Willis and was sentenced to death.   He appeals and enumerates as error:   (1) The refusal to grant a change of venue,   (2) The denial of a motion to quash the indictment and challenge the array of grand and petit jurors,   (3) The verdict finding against a plea of insanity and certain alleged errors in that proceeding, and   (4) Certain alleged errors committed during the trial of the case.

The evidence shows that on Saturday, November 11, 1967, at

2:50 a.m., the Valdosta Police Department in Lowndes County, Georgia, received a telephone call from a man saying that he had been shot and robbed at the Sing Oil East Hill station. A patrol car was dispatched to the scene and arrived there at 2:55 a.m. The officers found John Clarence Willis lying on the floor and still talking on the telephone with an officer of the Valdosta Police Department. He said that a young, slender, colored man, about 20 years of age and wearing a long dark overcoat, drove a light blue Chevrolet to the side of the gasoline station, went into the restroom, came back out, returned to the automobile, and purchased a gallon of gasoline from him. When he went back into the station to make change for the purchase and when he opened the cash register, the man shot him four times. He saw him reach for the money and he tried to get up from the floor whereupon the man shot him again in the head. The victim was removed to a hospital where he died about 2½ hours later from the gunshot wounds.

The evidence further shows that on the night of the crime the defendant drove a 1963 blue Chevrolet into the Sing Oil East Hill station. He was accompanied by another man named Mathis who was asleep on the back seat. Mathis testified that as the automobile entered the station it "bumped" and woke him up, that he heard the attendant put gasoline in the car, that he then heard two shots and raised up, that he saw the defendant's arm extended and then heard another shot, that he fell back in the seat, that the defendant returned to the automobile and they drove to the defendant's mother's house where they spent the night, that the defendant refused to tell him what had happened, and that later he (Mathis) hid the automobile in the woods.

The defendant's mother testified that about a week after the crime she found certain of the defendant's clothes with blood on them, his shoes, and a gun under her stove, that she buried the shoes and gun, that she later disclosed this information to the police officers, that she also gave the officers a long dark overcoat of the defendant's which was hanging in a closet. Ballistics tests showed the gun was the one used in the crime. The defendant had been seen with the same type of gun. There

was evidence that the defendant had only $1 before the crime but "seemed to have money" afterwards. The defendant was attempting to hide at the time he was apprehended. A description of the defendant shows him as 20 years of age, 6 feet tall, 158 pounds, with black hair, brown eyes and brown complexion.

■ Providential cause being shown, the motion to dismiss the appeal because the enumerations of error were not timely filed is denied.

■ The defendant moved for a change of venue alleging that he could not obtain a fair and impartial trial in Lowndes County for the reason that the jurors would have formed an opinion of his guilt from the publicity given his case. After the hearing, the trial court denied the motion.

The defendant in four separate enumerations of error setting forth specific circumstances complains in effect that the trial judge erred in not granting his motion for change of venue because the "massive, pervasive and prejudicial publicity" by the news media prevented him from obtaining a fair and impartial trial and that he was denied due process of law as guaranteed by the United States Constitution.

The evidence shows that Lowndes and adjacent counties are widely "covered" by a local daily newspaper, radio and television facilities, and that they reported the events surrounding this crime and the apprehension of the defendant. The publisher of the newspaper testified that, "We tried to report the events as the facts presented themselves"; that they tried to be very careful to point out that any person arrested is a suspect and to avoid any expression of guilt. The news director of one radio station testified that his station reported the events surrounding the crime on a factual basis. Four witnesses testified that the defendant could obtain a fair trial in Lowndes County; three of them further testified that they came into contact with a great number of people in the county from day to day and generally there was little discussion of the case. Four other witnesses testified that the defendant could not obtain a fair trial in Lowndes County and that most of the people they came in contact with had expressed an opinion that the defendant was

guilty. Two of these witnesses stated that from reading the newspaper articles they had formed an opinion that the defendant was guilty. Two of them stated that, if they were to serve on the jury, they would decide the case on the evidence introduced in court and they believed that other jurors would do the same. One Negro witness stated: "I feel like he [the defendant] would not get the chance he'd have elsewhere" but he further stated that if he were a juror he would decide the case on the evidence submitted at the trial.

Three newspaper articles dated December 4, 1967, December 12, 1967, and January 25, 1968, were introduced in evidence. The trial on the plea of insanity was held January 31, 1968. The trial on the murder indictment was held on January 31 through February 1, 1968. The newspaper articles were concerned primarily with a psychiatric examination and a neurological examination of the defendant. They reported that the examinations had been ordered by the trial judge; when, where and by whom the examinations had been made; that the results of the examinations showed the defendant was sane and had no brain damage; and that the solicitor general quoted the neurologist as saying that the defendant was "all right." The articles consistently referred to the defendant as the accused and expressed no opinion as to his guilt.

We have carefully reviewed the evidence, including the newspaper articles, introduced in support of the motion for change of venue. We find there was no pervasive prejudice in the community which denied the defendant a fair and impartial hearing and that he was not denied due process of law. *Morgan v. State,* 211 Ga. 172 (1) (84 SE2d 365); *Chatterton v. State,* 221 Ga. 424 (144 SE2d 726); and *Williams v. State,* 222 Ga. 208 (1), 211 (149 SE2d 449). Compare Estes v. Texas, 381 U. S. 532 (85 SC 1628, 14 LE2d 543); Sheppard v. Maxwell, 384 U. S. 333 (86 SC 1507, 16 LE2d 600).

■ The defendant moved to quash the indictment and he challenged the array of grand and petit jurors on the ground that Negroes were systematically and arbitrarily excluded from such juries. After a hearing, the trial court denied the motion.

The defendant in two separate enumerations of error complains that the trial judge erred in not granting the motion because the jury commissioners did not properly revise the jury list in Lowndes County in accordance with Georgia law, and that he has been denied due process and equal protection of the law under both the State and Federal Constitutions.

*Code Ann.* § 59-106 (Ga. L. 1967, p. 251) directs the board of jury commissioners to prepare a jury list of a fairly representative cross section of upright and intelligent citizens of the county from the official registered voters' list and, if they deem it necessary, to supplement the jury list through other inquiry.

The evidence shows that the 1960 census reports 26,943 persons over 21 years of age living in Lowndes County, of whom 7,809 are non-white; that there are 14,659 registered voters but they are not separated according to race and it is impossible without evidence on the question to ascertain how many are non-white; that the grand jury which indicted the defendant consisted of 22 members, 3 of whom were Negroes; that the petit jury drawn in November 1967 consisted of 175 members; that it was not known how many of them were Negroes, but Negroes served on that jury and had served on Lowndes County juries for the last 15 to 20 years; that the jury commissioners revised the jury list in Lowndes County in conformance with and shortly after the enactment of the 1967 Act; that the commissioners met five or six times consolidating the list and worked independently on portions of the list; that in addition to the voters' list they referred to telephone books, the city directory, made inquiry of individuals both white and non-white, and generally sought upright and intelligent citizens to include in the jury list; that no one was excluded because of his race and that they were sincerely seeking to obtain a fairly representative cross section of citizens for jury duty. There are 1913 jurors in the jury box but there was no evidence as to how many were white and how many non-white.

The evidence does not show any systematic exclusion of Negroes or purposeful discrimination in the selection of juries in Lowndes County or a failure of the jury commissioners to comply

with Georgia law. "The burden is, of course, on the petitioners to prove the existence of purposeful discrimination . . ." Whitus v. Georgia, 385 U. S. 545, 550 (87 SC 643, 17 LE2d 599).

The trial judge properly denied the motion.

■ The defendant filed a special plea of insanity on the basis that he is insane and has not sufficient mental capacity to make his defense. The evidence shows that the defendant volunteered for service in the U. S. Army in May 1966, that thereafter he was absent without leave on five occasions; that on September 4, 1967, he was dropped from the army rolls as a deserter. He was arrested for this homicide on November 19, 1967, more than 9 weeks before his trial, and his mother saw him at least once a week during this time. She testified that on such visits with him, he talked about his family, friends and relatively unimportant matters; that he talked "foolish" and would not give "precise answers"; that he did not talk about the crime with which he was charged except to deny that he committed it; that the Sunday prior to the trial, he would not speak to her at all; that in July 1967 he had eight stitches taken in his head as the result of an injury; that when she saw him in prison, he frequently complained of headaches; that he had acted "strange" ever since he had joined the army; that he was "not crazy, but something was wrong with him." The defendant would not let her cut his hair the Sunday before the trial although she had previously cut it for him.

The evidence shows that the county medical doctor at the request of the defendant's attorney visited the defendant the Sunday prior to the sanity hearing; that the doctor tried to talk to him but he would not reply. One of the defendant's sisters testified that the defendant had visited her in St. Petersburg, Florida, for a couple of days in July 1967, and again in September 1967; that he didn't act the way he acted when he was younger; that he was always "on the go." Another of defendant's sisters visited him shortly before Christmas 1967. She testified that he just stared at her and mumbled; that he did say that he had tried to hang himself and that he was going to kill himself. Another witness stated she visited the defendant the previous Sunday but he would not say anything; that not long prior to

the defendant's arrest, she had dates with him and he called for her and took her places but that he did not talk or act exactly right and that "his mind goes and comes."

The defendant was placed on the stand but refused to answer questions. Counsel for the defendant testified that he had made 8 or 9 trips to see the defendant and for the first 2 or 3 visits he was able to talk with him and the defendant knew who he was but that he noticed after the first visit, the defendant became less and less aware of why counsel was there and would not talk to him at all but just sat and stared at the wall.

The chief jailer testified that the defendant answered questions; that he saw no indication of his being mentally unbalanced or trying to harm himself; that he did not act in any unusual way; that he acted in a normal fashion for someone charged with a serious offense; and that counsel for the defendant had told him several times that the defendant had refused to talk to him.

Another jailer testified that until the day before the trial the defendant responded to his questions in a normal way; that he saw no evidence of his being mentally unbalanced; and that he acted like he was worried about something.

A deputy sheriff of the county testified that he took the defendant to Albany, Georgia, on two occasions about the beginning of December 1967 and talked with him en route. They discussed the events of the defendant's life, the trophies he had won in basketball and track and the defendant suggested that he go by his home to see his trophies. He visited the defendant every week while he was in jail and he appeared to him to be normal. The defendant asked him why his "girl friend" could not come to see him. The defendant talked to him on the way to the courtroom for the trial and they discussed some chicken they had eaten in Albany. On the way to the courthouse, the defendant pointed out a woman on the street as his grandmother. The officer asked him why he would not let his mother cut his hair last Sunday and he told him that he did not want her to cut it.

Another officer testified that the Saturday before the trial he overheard the defendant ask another person how Willie Frank Mathis was and that they were carrying on a normal conversation.

Sheriff Jewell Futch testified that he had been Sheriff of Lowndes County for 19 years and had a total of 32½ years in law enforcement; that he had observed many people who were in custody charged with serious offenses; that if the defendant had tried to commit suicide in jail, he would have known about it; that he periodically visited all prisoners held in jail; that he had observed the defendant during the several court hearings held in the case; that based upon his experience and training in law enforcement and his personal observation of the defendant, it was his opinion that he was able to co-operate with his attorney if he wanted to do so and that he could tell him anything he wanted him to know.

Dr. Otis J. Woodward, Jr., who specializes in psychiatry, testified that he had examined the defendant and from his examination and observation of him, the defendant knew where he was, could understand the nature of the charges against him, and could assist his counsel in the preparation of his defense. He testified that the defendant had an aggressive type of character disorder which makes him extremely dangerous. During the examination the defendant told him that he had received a blow on the head several months before and because of this fact, Dr. Woodward suggested that he be sent to a neurosurgeon for an examination. Dr. Woodward examined the defendant some two months before the trial and he further testified that it was practically unheard of for anyone under the defendant's circumstances to develop a psychosis during the time since his examination; that it is a common occurrence for someone charged with a serious crime and awaiting trial to feign insanity; and that it happens so frequently it has been named Ganser's syndrome.

(a) Enumeration of error number 1 on the plea of insanity complains because the defendant was allowed only a panel of 24 jurors and six strikes to try the special plea of insanity in a capital felony case.

This court in *Bacon v. State*, 222 Ga. 151, 153 (149 SE2d 111) held that the special plea of insanity was civil in nature, was an issue in the case which *Code* § 27-1502 required to be tried before a special jury, and was no part of the criminal proceedings pending against the defendant. 23 CJS 746, § 940 (5).

Accordingly, the defendant was properly allowed 2 panels of 12 jurors each (24) from which to strike a jury and was entitled to six strikes. *Code* §§ 59-703, 59-704; *Ellis v. Greer,* 26 Ga. App. 519 (1) (137 SE 290).

This enumeration of error is without merit.

(b) On November 22, 1967, the trial judge directed that the defendant be taken to the office of Dr. Otis J. Woodward of Albany, Georgia, for examination and evaluation. The order further recited that the defendant was under indictment for murder and contended he was not of sound mind. Enumerations of error numbers 2, 3 and 4 on the plea of insanity complain that the court erred in ordering a psychiatric examination of the defendant one day after his arrest, in having him so examined 10 days later, in ordering him examined by a neurologist two weeks thereafter, and in not allowing him counsel during every step of the proceedings in violation of his constitutional rights.

"Under the common law, when a suggestion of insanity was made upon arraignment, the judge always investigated the case and determined for himself whether the accused had sufficient mental capacity to go to trial." *Flanagan v. State,* 103 Ga. 619, 622 (30 SE 550).

"Both at common law and by statute in many jurisdictions, if at any time while criminal proceedings are pending, the court observes facts which raise doubt as to the sanity of the accused, or such facts are brought to its attention by counsel, the question of his sanity should be settled before further steps are taken. Though the matter is ordinarily raised by defense counsel or by the prosecution, the trial court has inherent authority to investigate the question of the present sanity of the accused, and may do so on its own motion." 21 AmJur2d 146, § 64; 23 CJS 727, § 940 (2a).

"During the preliminary determination as to whether a formal inquiry into present sanity will be ordered, it has been held that the defendant has no right to be represented by counsel, call witnesses, or the like, his rights being sufficiently protected by the opportunity to present evidence of present mental condition at the trial." 21 AmJur2d 148, § 65.

We hold therefore that the trial court had the inherent right

to investigate the question of the present sanity of the defendant before further steps were taken in the case and that no constitutional rights were violated thereby. These enumerations of error are therefore without merit.

(c) In enumeration of error number 5 on the plea of insanity the defendant complains that the trial court, over objection, erred in allowing Sheriff Jewell Futch to give testimony as an expert and to give his personal opinions about the defendant's sanity.

"Sanity or insanity is a proper subject for opinion evidence. In such a case 'any witness may swear to his opinion or belief, giving his reasons therefor.' Code (1910), § 5874 [now *Code* § 38-1708]. An expert witness may base his opinion on any hypothetical statement of facts, and may state his opinion without giving any reasons. That the statement of facts or reasons given by the sheriff as a basis for his opinion as a non-expert witness was sufficient to authorize the admission of such opinion is decided by former rulings of this court." *Strickland v. State,* 137 Ga. 115, 117 (72 SE 922); *Jarrard v. State,* 206 Ga. 112 (3, 4) (55 SE2d 706).

The sheriff in this case gave the facts and reasons on which he based his opinion of the defendant's sanity and there is no merit in this enumeration of error.

(d) Enumerations of error numbers 6 and 7 complain of the admission in evidence of testimony of Dr. Otis J. Woodward, Jr. concerning the tests given the defendant and allowing him to place the defendant's character in issue by testifying as to his opinions of the defendant.

When the defendant filed his special plea of insanity in this case and introduced evidence in support of it, the issue of insanity was raised and he cannot complain that his character was placed in issue because the State introduced evidence to refute his plea.

There is no merit in these enumerations of error.

(e) The defendant contends in Enumerations of error numbers 8 and 9 that the court erred in allowing the solicitor general to state to the jury that if they found in favor of the plea of insanity the defendant would be sent to Milledgeville State Hospital and would remain there until discharged in the manner pre-

scribed by law. The defendant also contends that the trial court erred in charging the jury to the same effect and that if they found against the plea of insanity, he would be placed on trial.

Both of these statements are correct statements of the law and there is no merit in these enumerations of error. *Code* §§ 27-1502, 27-1504.

(f) The verdict of the jury on the special plea of insanity was amply supported by the evidence and there is no merit in Enumeration of error number 10.

■ The defendant complains of alleged errors in his trial for murder in four enumerations of error as follows:

(a) Enumeration of error number 1 insists that the only eyewitness to the crime was threatened and scared by police officers into swearing falsely against the defendant and that the court erred in allowing his testimony to go to the jury.

A careful review of the evidence fails to reveal any intimidation of witnesses or perjury. These matters were fully explored by defense counsel on cross examination. The credibility of witnesses is determined by the jury. There is no merit in this enumeration of error. *Code* § 38-1805. See *Gant v. State,* 115 Ga. 205 (3) (41 SE 698).

(b) Enumeration of error number 2 insists that the court erred in permitting the solicitor general to make prejudicial remarks before the jury concerning the defendant's intent. The record shows that the solicitor general stated he wished to call another witness for the purpose of showing the "intent and bent of mind of the accused" by a similar crime. Upon defendant's objection, the jury was excused. After inquiry by the court, the defendant's objection was sustained and such evidence was excluded. The defendant's objection was to the evidence and this was sustained. If the statement of the solicitor general was prejudicial, the defendant should have moved for a mistrial. He cannot raise this point for the first time on appeal. Furthermore, the court directed the jury to disregard any statement of the solicitor general. *Code* § 81-1009. This enumeration of error is without merit.

(c) Enumeration of error number 3 insists that the court erred in allowing the testimony of Dr. Woodward concerning a psy-

chiatric examination performed by him upon the defendant upon an order of the trial judge issued one day after his arrest without the benefit of counsel in violation of the sixth Amendment of the U. S. Constitution.

This enumeration of error is without merit. See 4 (b) above.

(d) Enumeration of error number 4 insists that the court erred in charging the jury on defendant's insanity, mental incompetency, doctrine of right and wrong, and generally confused the jurors as to verdicts and punishments.

We have carefully reviewed the entire charge and find no error harmful as a matter of law.

*Judgment affirmed. All the Justices concur.*